ARTHUR H. HEWITT v. ESTHER H. BAKER AND ANOTHER.[1]

July 12, 1946.

No. 34,213.

[1]Reported in 24 N. W. (2d) 47.

Meighen, Knudson & Sturtz, for appellant.
Vollum & Nichols, for respondent.

JULIUS J. OLSON, JUSTICE.

This was a suit to have a deed of general warranty executed by plaintiff and wife to defendant Esther H. Baker on November 28, 1932, declared to be a mortgage and for an accounting by the grantee as a mortgagee in possession. The court found for plaintiff. Defendant's husband, Frank E. Baker, was originally joined and appeared as a party defendant. He died during the litigation. No substitution was made, since his inchoate interest in the property in this litigation terminated upon his death. The appeal by Mrs. Baker is from an order denying her blended motion for amended findings or a new trial.

During the course of trial, counsel stipulated that the accounting matter, "if reached, may be tried later." On the main issue, i. e., whether the transaction was a deed or a mortgage, the court concluded that plaintiff had made his case. Consequently, the next evidentiary installment of the trial related to the accounting issue.

The farm in question was owned by the father of plaintiff and defendant, who are brother and sister. Plaintiff became the sole owner thereof following the father's death in 1916 and continued to operate it for a year or more, after which he moved to Albert Lea. During the first World War, at a time when farm prices moved to unheard-of levels, plaintiff sold the farm for approximately $150 per acre, receiving something over $4,000 in cash and accepting a purchase-money mortgage for the balance of $20,000. The deflation which set in after that war soon demonstrated that the purchaser could not pay this obligation, nor could those who succeeded him in title and interest. The farm finally came back to plaintiff in 1927, with the buildings in bad shape. In order to restore these, plaintiff mortgaged the farm for $5,000, most of which was used in the construction of a new barn. He was unable to pay that mortgage, and in May 1931 executed a new mortgage in the same amount to take care of that obligation.

In the meantime, plaintiff had purchased a dwelling house in Albert Lea for $6,000, giving a mortgage as part payment. That mortgage was refinanced in 1933, but in 1937 that home was lost under foreclosure. Since that time, plaintiff's financial difficulties have gradually and progressively grown worse. He has been compelled to perform common labor jobs. He was employed under the WPA setup and continued in that kind of work as long as that agency operated.

In the fall of 1932 plaintiff was in default in meeting his taxes. The mortgagee wanted the $5,000 debt secured thereby paid. He was without funds to meet these pressing claims. He appealed to his sister for help. In addition to the tax and mortgage obligations, he then owed his sister $1,585, which with accumulated interest amounted to $1,893.80, represented by his unsecured notes.

The means to accomplish this result were not easily arrived at. Esther and her husband did not take kindly to the idea of financing plaintiff's needs by taking a mortgage. They thought a deed to the premises would afford a better method than the giving of a mortgage. Both plaintiff and his wife were willing to do as Esther and her husband suggested, but they wanted something in writing to prove that when the property was sold by Esther she would pay to plaintiff everything beyond all moneys due her from him, plus a reasonable return on her investment, together with needed expenses which she might incur in the maintenance of the farm, payment of taxes and the like from the date of transfer until the farm was sold. After repeated requests by plaintiff, such an instrument was finally prepared by Esther on April 21, 1933, who delivered it to plaintiff, and he has retained it ever since in the belief that he was the actual owner of the farm and that his sister held the paper title as security. Such was the arrangement when the deed in question was executed. That instrument (exhibit A) reads:

"Albert Lea, Minnesota
"April 21, 1933

"To Whom it may concern:

"I, Esther H. Baker, wish hereby to certify:

"(1) That I own the following parcel of real estate [description of farm]

"(2) That when this land can, in my discretion or in the discretion of those handling this for me or with me, be advantageously sold or transferred, it shall be so disposed of.

"(3) That after this transfer has been made, after I have received for myself through said transfer all moneys which are due me from this sale of land plus a reasonable return on my investment together with any and all expenses which I may have incurred from date of possession to the date of transfer, any excess collected or paid me or my representatives after my interests have been taken care of as above is due and payable to my brother, Arthur H. Hewitt, or his heirs or legal representatives.

"Esther H. Baker"

A copy of that instrument was attached to plaintiff's complaint and made a part thereof. Its execution is not questioned by defendant, but in avoidance of it she pleaded that she had revoked the instrument of April 21, 1933. She attached to her answer as exhibit 1 a copy of the revocation. In substance, this is what that instrument says:

"Revocation.

"Know All Men by These Presents, That the instrument dated at Albert Lea, Minnesota, April 21, 1933, signed by me, Esther H. Baker, and having reference to the following parcel of real estate situate in Freeborn County, Minnesota, namely: [description of premises] is hereby fully and forever cancelled, withdrawn and annulled. Said instrument of April 21, 1933, was wholly voluntary, gratuitous and unilateral, without consideration, and, as *I have for good reason changed my mind, I make and deliver this instrument to evidence said change of mind.* [Italics supplied.]

"* * * I have made no promises, either oral or written, that control in any way my right to use my own judgment about said real estate, and I am under no duty to account to anyone for the income from said real estate or for the proceeds in event of sale.

"Witness my hand at Albert Lea, Minnesota, this 18th day of July, 1944.

"(Signed) Esther H. Baker."

This instrument was recorded in the office of the register of deeds on July 19, 1944. This suit followed on August 19, 1944.

The deed was prepared by a banker of long experience. There was no memorandum or other written agreement as to the vital issue here involved, i. e., whether the deed was to operate as a complete conveyance or one of security only; nor was there any note or other written obligation executed by plaintiff to evidence a loan, and no such instrument was demanded or even requested by defendant. When the deal was made, the farm was in the physical possession of plaintiff's tenant, who continued in such possession for some time thereafter, but subsequent to the transfer to Esther

he paid the cash rent to her. After his tenancy ended, Esther operated the farm by other tenants of her choice.

In addition to what has been recited, the court found that at the time of executing the deed the farm was reasonably worth $11,000 to $12,000; that the annual cash rental value was six to seven dollars per acre and during later years increased to seven or eight dollars per acre. At the time of the deed transaction, the court computed plaintiff's indebtedness to Esther, including the $5,000 mortgage, interest thereon, taxes, etc., to be $7,536.29. Since then, Esther has been charged each year with the cash income received by her, and she was allowed ten percent of the annual rental collection. In addition thereto, she was credited with all other items paid or incurred. She was also credited annually with interest upon the balance remaining unpaid at the rate of six percent. The court in its findings thereby allowed her as compensation for her management of the farm a total of $1,012.50 during the time mentioned. Her interest upon the total debt was computed from year to year and added to the former balance at six percent, and in all it amounted to $5,799.68 at the time of trial. In addition, the court also credited her with $110 loaned to plaintiff in 1938 with interest at the full legal rate. The total of plaintiff's indebtedness was determined to be $8,245.64. At the time of trial the land was reasonably worth $100 per acre, an amount in excess of $15,000.

As conclusions of law, the court determined:

"1. That the * * * warranty deed executed and delivered by plaintiff to the defendant Esther H. Baker was given as security for an existing indebtedness and a new and additional loan negotiated at or about the same time. That said warranty deed was at the time of its execution and delivery a mortgage and so remained and constitutes and is a mortgage at the present time.

"2. That plaintiff is entitled to judgment determining that he is the owner in fee of the real estate and premises [describing land], subject to a mortgage lien in favor of the defendant Esther H. Baker in the sum of $8,245.64, with interest from March 1, 1945, at 6% per annum.

"3. That plaintiff is entitled to credit on said indebtedness of the balance of the 1944 rental of said premises in the sum of $300 less improvements and repairs made by the tenant in the year 1944 and credit for all rentals paid in the 1945 rental year.

"4. That plaintiff is entitled to the costs and disbursements of this action."

One of defendant's main contentions here is that exhibit A, the instrument given by her to her brother (Appellant's Brief, pp. 13 and 14)—

"was purely a voluntary, gratuitous and unilateral act prompted by a sister's kindness and not the result of any agreement made in advance either at the bank conference [when the deed was executed] November 28, 1932, or at any other time. It was a promise to make a gift, a promise for which no consideration of value moved to Mrs. Baker."

We find it difficult, as did the trial court, to go along with defendant's argument or to accept as true her protestations in this regard. What she promised to do and actually did was neither purely altruistic nor a gratuitous act. She knew that her brother was impecunious and improvident (in her brief she says of her brother that he is " 'poison' to property") and that he had nothing with which to meet the obligations he already owed her except his equity in this farm. His home in Albert Lea was heavily mortgaged, and, besides that, it was exempt as his homestead. Defendant had no security of any kind to which she could look with any hope of realizing her claim against her brother. The $5,000 mortgage was of course a prior lien upon the farm. If she were to salvage anything for herself in the way of enforced collection, she would naturally have to bring an action and recover judgment. That would not bring her any money unless she levied upon this land, and then, after having done so and secured title in that way, she would still have to take care of taxes that had accrued, the principal sum secured by the mortgage, including interest accumulated thereon, and possibly expenses of foreclosure. As between

the mortgage holder and plaintiff, there obviously was a very size‑able equity of from $6,000 to $7,000 belonging to her brother. Even with defendant's own claim with interest computed in full to the date of the deed, plaintiff had an equity of approximately $4,500. There was thus an adequate and substantial basis upon which to build the accommodation plaintiff wanted, since thereby defendant saved the farm for her brother and, incidentally, greatly improved her own claims against him. If she had refused to help him in the way she did, plaintiff obviously would have had the income from the farm for at least another year, a matter of $765 cash rent from a responsible tenant. She has collected cash rents during the period she has had charge of the farm in the sizeable amount of $9,800. In these circumstances, we cannot say that the trial court went far wrong in determining that plaintiff's equity in this val‑uable farm has not wholly disappeared.

Mr. O. B. Anderson, who prepared exhibit A for defendant and who was called as her witness, testified as follows as to the basis for the terms to be used therein:

"Q. What did she say?

"A. Well, she told me that there had been some difficulty in the financing of the farm, and that Hewitt, her brother, needed some money in order to save the farm, and that she was willing to help him if she had proper security. That she wouldn't simply be throwing her money out of the window, and she told me at that time that she felt she had proper security. * * *

* * * * *

"Q. Perhaps I can make myself clearer by this question. I find in the instrument the provision in paragraph 2, that when this land can in my discretion, or in the discretion of those handling this for me, or with me, be advantageously sold or transferred, it shall be so disposed of. What instructions were given you that led you to put that into the instrument? That refers to para‑graph 2.

"A. Well, simply that she wasn't—didn't have in mind getting anything for herself in the form of a profit; she was interested

only in getting her money back that she had risked in this transaction, and her hope was that the Hewitts would eventually have this farm as their own."

On cross-examination, defendant testified:

"Q. Mrs. Baker, you intended to follow out the plan expressed in your writing [exhibit A] that you gave him, didn't you?

"A. I said repeatedly I intended to give him something.

"Q. You were going to give him everything over and above what you had invested?

"A. Well, matters have changed very greatly.

"Q. That is what you agreed?

"A. Perhaps I did but I can change my mind.

"Q. You signed that writing, exhibit 1 [same as exhibit A]?

"A. Yes, I did.

"Q. Was that your agreement with your brother Arthur?

"A. That was my signature.

"Q. That is what you agreed to do at the time you signed that instrument?

"A. Yes, but one can change their mind, can't they?"

In substance we have these facts: The parties to this cause are brother and sister; the farm is a valuable one and has long been in the ownership of some member of the Hewitt family. Plaintiff was the fee owner thereof, subject only to a $5,000 mortgage when he executed the deed presently involved. Exhibit A was executed and delivered in conformity with and as a part and portion of the arrangement made at or prior to the time of the execution of the deed. The arrangement had for its plain purpose that defendant would have security for what plaintiff owed her, and that by this instrument provision would be made, as found by the trial court, "for the sale and transfer of said land when advantageous and upon such sale" defendant would remit "the balance of the proceeds to the plaintiff" after she "had received for herself all moneys due her from such sale * * * plus a reasonable return on her investment, together with any and all expenses" incurred from the

date of possession to the date such sale was actually made. And we have this further fact, found by the court and supported by the record, that from the time the deed was given and until at least 1943 plaintiff had from time to time urged defendant to sell the property so that he might discharge his obligations and have the surplus for his dire needs. This was particularly true in the late 1930's when his home at Albert Lea was about to be taken from him because of his failure to meet monthly payments under his HOLC loan arrangement. His pleas were met with the standard assertion that the time was not yet ripe to make a sale—to hang on for better prices. Not until 1944 was there a repudiation of the arrangement evidenced by exhibit A, upon which plaintiff relied. Then, for the first time, plaintiff was informed that the deed was an absolute conveyance and that he had no interest in the property. That year, too, is the time when defendant executed and caused to be recorded her "Revocation." It is appropriate also to recite the fact that neither the original mortgage papers nor plaintiff's notes to defendant were ever surrendered. Defendant kept them in her possession until the trial, when they were deemed useful to her purpose.

In cases of this type, our first duty is to determine from the facts shown what the parties intended. In the case of King v. McCarthy, 50 Minn. 222, 225, 52 N. W. 648, where the sole issue was whether a conveyance was a mortgage or a conditional sale and the only question on appeal was the trial court's finding that the deed was in fact a mortgage and not a conditional sale, we said (Mr. Justice Mitchell speaking for the court):

"No conclusive test of universal application can be suggested to determine whether such transactions are mortgages or conditional sales. Each case must be decided in view of its own peculiar circumstances. *The true test is, what was the intention of the parties? Did they intend security or sale?* This is to be gathered from the surrounding facts and the situation of the parties, as well as from the written memorials of the transaction. And while it is undoubtedly true that, in order to convert what appears on the face

of the written contract to be a sale into a mortgage the evidence should be clear that the real intention of the parties was to execute a mortgage, yet the inclination of the courts is to construe the contract to be a mortgage rather than a conditional sale, whenever the evidence will reasonably admit of it." (Italics supplied.)

And further (50 Minn. 226, 52 N. W. 649) :

"It is often laid down in the books that the existence of a debt is the test whether a transaction is a mortgage or a conditional sale, and much stress is laid by defendant's counsel upon the fact that there was no note or bond given by McCarthy as evidence of any debt to Bell, and that there was no covenant or any personal obligation to pay what Bell should advance to clear the property. This, if true, would be a circumstance of no inconsiderable importance, but it is not complete or conclusive evidence that a transaction was a sale, and not a mortgage.

"This court has twice held that, where the real nature of the transaction is a loan advanced upon the security of real estate conveyed to the party making the loan, it is none the less a mortgage because the advance is made wholly upon the security, and without any personal obligation on the part of the borrower." (Citing cases.)

Here, as in that case, defendant has stressed that feature. While it was "a circumstance of no inconsiderable importance," it was "not complete or conclusive evidence" that the "transaction was a sale, and not a mortgage."

The rule there stated has been our guide in a great many cases. These are found in 4 Dunnell, Dig. & Supp. § 6154. The substance is thus summarized as the author's text:

"A deed absolute in form but originally intended by the parties as security merely is regarded in equity as a mortgage. The fraudulent possibilities inherent in such a transaction are the basis of the equity. It is unnecessary to prove fraud, mistake, or surprise, in the execution of the deed. Nor is it necessary to prove damage

or threatened damage. All that it is necessary to prove is the intention of the parties. This intention must have been mutual."

In the next section (6155) we find:

"Parol evidence is admissible not to contradict the terms of the writing, but to show the grantor's equities in the case, or, as it is sometimes said, to establish an equity superior to the terms of the deed, and because it would be a fraudulent act, which a court of equity would not permit, for the holder of the deed to use it contrary to the terms and understanding upon which he received it. As the equity upon which the court acts arises from the real character of the transaction, either parol or written evidence is admissible to establish it. The intention is to be gathered from the written memorials of the transaction, from the circumstances under which the deed was made and the relations subsisting between the parties. All of the instruments executed by the parties at the same time and as part of one transaction are to be construed together, as if but one instrument, in order to ascertain the real intention of the parties."

Our cases are there found and their citation here is not deemed necessary.

This case is wholly different in its facts from such cases as Citizens Bank v. Meyer, 149 Minn. 94, 100, 182 N. W. 913, 915, for the plain reason that when the deed in that case was given "the total value of the land at that time was less than the amount of the mortgages then against it"; and, similarly, that, too, was the fact in O'Connor v. Schwan, 190 Minn. 177, 184, 251 N. W. 180, 183, where we held:

"The trial court specifically finds, and his finding is supported by the evidence, that the value of the land at the time of the conveyance was less than the amount of the mortgage indebtedness."

In both cases the findings below were sustained here.

We conclude that the trial court's findings are adequately sustained by the evidence; hence the order must be and is affirmed.

Affirmed.