LAND O' LAKES DAIRY COMPANY v. COUNTY OF
WADENA AND STATE.
STATE v. LAND O' LAKES DAIRY COMPANY.[1, 2]

July 22, 1949.

Nos. 34,955, 34,956.

[1]Reported in 39 N. W. (2d) 164.
[2]Judgments affirmed by U. S. Supreme Court December 12, 1949.

*Doherty, Rumble, Butler & Mitchell* and *Harold Jordan,* for appellant.

*J. A. A. Burnquist,* Attorney General, *George B. Sjoselius,* Deputy Attorney General, *Charles P. Stone,* Assistant Attorney General, and *Charles W. Kennedy,* County Attorney, for respondents.

PETERSON, JUSTICE.

These two appeals were heard together. One is from a judgment denying an injunction enjoining the enforcement of a judgment recovered by the state against real property of the Land O' Lakes Dairy Company (herein referred to as the "dairy company") for real estate taxes for the year 1945. The other is from a judgment recovered by the state against the dairy company for personal property taxes for the year 1945.

The questions for decision are:

(1) Whether a transaction between the government of the United States and a contractor constitutes a mortgage, where the transac-

tion is evidenced by three written instruments, viz.: A contract, a lease, and a combined warranty deed and bill of sale, which provided in effect that the contractor should acquire land, erect thereon a building and equip it for manufacturing a product to be used for national defense; that, after having completed the erection and equipment of the facility mentioned, the contractor should convey and transfer title thereto to the government for a purchase price to be determined in the manner provided by the contract upon condition subsequent that the title should *revert* to the contractor upon payment by it, after the President had declared the facility to be no longer needed for defense purposes and while the lease or an extension thereof was in force, of an amount equivalent to the purchase price paid by the government less depreciation of the property computed according to contractual formula; that during the life of the lease the contractor should pay a stipulated rental for occupation and use of the facility; that upon payment of such sum the government would execute written instruments to evidence the reversion of the title; and that, if such payment was not made, the title vested in the government by the warranty deed and bill of sale should become indefeasibly vested in it;

(2) Whether, if such a transaction constitutes a mortgage, the property is immune from state taxation because of the federal government's ownership of an interest therein as mortgagee; and

(3) Whether a declaratory judgment, determining that the mortgagor was liable as against the claim of federal immunity from taxation for a personal property tax based on its ownership of personal property, is *res judicata* in a proceeding to enforce payment of personal property taxes of the question whether the mortgagor is liable for such taxes as against the defense of federal immunity therefrom.

Pursuant to authority granted by 22 USCA, §§ 411-419 (Lend-Lease Act), and 55 U. S. St. 53-55 (Defense Aid Supp. Appropriation Act, 1941), the government arranged with the dairy company to have it acquire and operate a milk processing plant for manu-

facturing nonfat dry milk solids or such other products as might be specified by the government, which were to be first offered for sale to it. The transaction was evidenced by three writings, viz., a contract, a lease, and a combination warranty deed and bill of sale.

The contract (dated June 9, 1944), so far as here material, provided that the dairy company should acquire, if it was not the owner thereof (and it was stipulated that it was not), a tract of land upon which to erect the processing plant; that the dairy company should construct thereon at its own expense the processing plant and equip it according to the government's plans and specifications; that the dairy company should also equip certain creamery receiving stations in the trade area surrounding the plant; that the dairy company, after it had constructed and equipped such property, which it was agreed was to be referred to as the "facility," should convey and transfer title thereto to the government; and that the government should pay the dairy company a price therefor to be determined according to the contract, which afterward was agreed to be $415,-285.51. The contract provided that "title to the facility shall however, be subject to the following condition to be provided for, substantially, in each instrument of title or conveyance," viz., that if the President of the United States should declare that the facility was no longer needed for defense purposes and the dairy company should during the lease or a continuation thereof pay a sum of money to the United States equivalent to the total consideration paid by the government for the facility, not including the cost of the land, less an annual depreciation of ten percent thereof, title to the facility should "revert" to the dairy company, but that the government should not be responsible for the condition or state of repair of the facility at the time title thereto "reverts" to the dairy company. It was further agreed that "upon the reverting of the title" as aforesaid the government should execute and deliver to the dairy company written instruments "to evidence the happening of the reversion of title"; that, should the dairy company fail to make the payment within the time specified, "said condition subsequent shall be null and void," and title to the facility "then vested in the Gov-

ernment shall be indefeasible." It was also provided that the dairy company should pay for documentary revenue stamps and filing and recording fees, and that it should bear loss caused by fire prior to the acceptance of the facility by the government.

Simultaneously (on June 9, 1944), the government executed a written lease of the facility to the dairy company for a term of five years for the purposes stated in the contract, reserving an annual rental equivalent to 11 percent of the total consideration paid for the facility. Under the lease, the dairy company was obligated to offer for sale to the government all products processed in the facility; to keep the facility insured at its own expense against loss by fire and other hazards to be specified; and to pay, at least ten days prior to delinquency, "all taxes assessed or other governmental charges that may be legally imposed upon or constitute a lien against the facility or any part thereof." There were covenants against subleasing and subletting by the dairy company. The dairy company was granted the right to renew the lease, as follows: (1) If the President had not made the declaration mentioned and if the lease was still in force, to renew it for another term of five years upon the same terms and conditions as those contained in the original lease; and (2) if at the end of such renewal period the President had not made such declaration and if the lease as renewed was still in force, to renew it for another term of ten years upon the same terms, etc., except that the rental was to be $10 per month. The lease contained provisions authorizing the government to terminate the lease as renewed.

On November 24, 1945, the dairy company, in consideration of $415,285.51, of which $322,810.24 represented the purchase price of the land and the cost of the buildings, including permanent fixtures and installations, by a combination warranty deed and bill of sale conveyed the facility to the government, subject to the condition subsequent, which by the terms of the contract was to be included in

268

the deed and bill of sale and which was set forth therein substantially in the language of the contract.[3]

By amendments to the contract and the lease executed on November 6, 1945, it was agreed, among other things, that title to the facility should be considered as having vested in the government on April 1, 1945; that the term of the lease should be considered as commencing on April 1, 1945; and that the provision of the lease obligating the dairy company first to offer to the government products processed in the facility be deleted.

The dairy company has been at all times in possession of the facility and has operated it ever since it became capable of use.

---

[3]The condition contained in the deed and bill of sale, so far as here pertinent, reads:

"PROVIDED, HOWEVER, That if, after the date of a declaration by the President of the United States of America that the above described premises and said machinery, equipment and personal property are no longer needed" for defense purposes "and at any time during the life of a lease between the parties hereto," or "of any extension or renewal" thereof, the dairy company shall pay to the government "a sum of money to be determined as hereinafter provided, the title to" the facility "shall *revert*" to the dairy company, which sum to be so paid shall be as follows: "The above stated total consideration paid [$415,285.51]" by the government to the dairy company for the facility "less an amount representing depreciation, obsolescence and loss of value due to use of said premises and of said machinery, equipment and personal property for national defense purposes, which said amount shall be calculated at the rate of ten (10) per cent per annum, commencing April 1, 1945, of the total consideration first above stated, less the consideration paid the said party of the first part for the land described herein without improvements, which amount represents Three Thousand Two Hundred Two and 76/100 Dollars ($3,202.76)"; and

The government shall not be responsible for the condition or state of repair of the facility "at the time title thereto *reverts*" to the dairy company, and the dairy company "shall accept" the facility "in the condition in which" it then is. The dairy company "covenants that if it fails to make payment of the sum of money as provided within the time above prescribed, *such condition subsequent* shall become of no force and effect and the fee simple title to" the facility "*hereby vested in the said party of the second part [government] shall then become indefeasibly vested in the said party of the second part.*" (Italics supplied.)

On July 31, 1946, the President made a declaration that the government no longer needed the facility for defense purposes.

The dairy company has not exercised its right to terminate the lease and to pay the amount due the government in order to obtain a reversion to it of the title which it conveyed to the government.

Pursuant to M. S. A. cc. 273 and 275, a real estate tax for the year 1945 amounting to $3,249 was assessed against the real estate in question, effective as of May 1, 1945 (May 1 is the tax day), and a personal property tax for the year 1945 amounting to $6,143.33 was assessed against the dairy company effective as of May 1, 1945, based upon its ownership of machinery and equipment in its plant located in the village of Sebeka.

Thereafter, the dairy company commenced a declaratory judgment action to have determined whether it was liable for the taxes in question. The district court sustained demurrers to the complaint upon the ground that, while a taxpayer has a right in such cases to maintain an action for a declaratory judgment to have determined its liability for both real property and personal property taxes, the dairy company upon the merits was liable for the taxes in question. On appeal, we affirmed so far as the order concerned the dairy company's liability for the personal property tax and reversed so far as it concerned its liability for the real estate tax. Land O' Lakes Dairy Co. v. Village of Sebeka, 225 Minn. 540, 31 N. W. (2d) 660. The reversal was upon the ground that the remedy by declaratory judgment was not available to the dairy company to determine its liability for real estate taxes because c. 278 provides the *exclusive remedy* for contesting real estate taxes. Thereafter, pursuant to the mandate of this court, judgment was entered in the district court to the effect that the dairy company was entitled to no relief from the personal property taxes and that the declaratory judgment action be dismissed so far as it related to the real estate taxes, upon the ground that such action could not be maintained by it.

Subsequently, judgment was entered in the proceedings to enforce payment of real estate taxes for the year 1945 against the real property for the amount of the real estate tax then due. Pursuant to

the judgment, the real estate was bid in at the tax sale for the state of Minnesota. There has been no redemption from the sale, nor any assignment or transfer by the state of its rights as purchaser at the sale. It is the enforcement of the tax judgment which the dairy company seeks to have enjoined. The district court found as a fact that the assessment embraced "without qualification all interests in said [the dairy company's real] property," and as a conclusion of law that the dairy company was not entitled to any relief. In a memorandum made part of its decision, the court found that the warranty deed was "in reality a mortgage to secure the Government for the money it advances and for the faithful performance of the contract by the lessee [the dairy company]" and that "The rights acquired by the state in such proceedings are *subordinate* to the rights in the rem [*sic*] held by the United States Government." (Italics supplied.) No assignments of error thereon have been made in this court. The dairy company appeals from the judgment entered pursuant to the court's findings and conclusions.

In answer to the citation in the proceedings to enforce payment of the 1945 personal property taxes, the dairy company pleaded that the government owned the property for which it was taxed and that the government was immune from such a tax. The state asserted that the declaratory judgment, which was shown by stipulation, was *res judicata* of the dairy company's tax liability, and the trial court so held. In its memorandum it indicated that, aside from *res judicata,* it would have held the dairy company liable for the tax, upon the grounds that the relation between the dairy company and the government was that of a mortgagor and mortgagee and that governmental immunity from taxation had no application under the circumstances.

Briefly, the dairy company contends that the transaction constituted a sale and a lease back. The state contends that the transaction was a mortgage, for the reason that, while the instruments used to evidence it were in the conventional form of a contract, lease, and deed and bill of sale, in substance the transaction was one under which the government was to advance the money for the con-

struction and equipment of the facility and take title thereto as security for not only the money advanced but also for performance by the dairy company of its contract to manufacture war materiel, and that the terms of the condition subsequent under which title was to *revert* to the dairy company are not only indicative of intention to mortgage, but are the conventional way of doing so. The dairy company, answering this contention, contends that there was no mortgage because there was no debt and no personal liability on its part to pay a debt. The state counters that neither a debt nor personal liability to pay one is necessary—that the advance may be wholly upon the security without personal obligation on the part of the borrower.

■ A mortgage of realty is a conveyance of realty intended as security for the payment of money, or the performance of some act. Lundeen v. Nyborg, 161 Minn. 391, 201 N. W. 623; Buse v. Page, 32 Minn. 111, 19 N. W. 736, 20 N. W. 95; Madigan v. Mead, 31 Minn. 94, 16 N. W. 539 (money advanced). The conventional form of a mortgage is a conveyance absolute, defeasible upon the happening of a condition subsequent such as the payment of money or the performance of some act. Ozmun v. Reynolds, 11 Minn. 341 (459); Pace v. Chadderdon, 4 Minn. 390 (499); 4 Dunnell, Dig. & Supp. § 6145; 59 C. J. S., Mortgages, § 1. The language usually employed is such as is used in a deed for a conveyance absolute, but with an added provision that upon payment of the debt or performance of the act, "then this deed shall be void"; but an equivalent expression of defeasance is sufficient. 1 Jones, Mortgages (8 ed.) § 87, and the cases there cited.

A chattel mortgage is a conveyance of personalty intended as security for the payment of money, or the performance of some act. Thoen v. First Nat. Bank, 199 Minn. 47, 271 N. W. 111; First Nat. Bank v. Flynn, 190 Minn. 102, 250 N. W. 806, 92 A. L. R. 1272; Ash Creek State Bank v. Zwart, 158 Minn. 100, 196 N. W. 935; Scofield v. National Elev. Co. 64 Minn. 527, 67 N. W. 645; Moore v. Norman, 43 Minn. 428, 45 N. W. 857, 9 L. R. A. 55, 19 A. S. R. 247; Merrill v. Ressler, 37 Minn. 82, 33 N. W. 117, 5 A. S. R. 822; 1 Dun-

nell, Dig. & Supp. § 1424. Like a mortgage of realty, a chattel mortgage ordinarily is in form an absolute conveyance defeasible upon the happening of a condition subsequent, such as the payment of money or the performance of an act. Thus, it is clear that the same rules govern in determining whether a conveyance of either realty or of personalty is in fact a mortgage.

We think that the combined warranty deed and bill of sale here is in form and substance a mortgage of both realty and of personalty. It contains all the elements of one. It contains language of absolute conveyance. The conveyance is expressly made upon condition subsequent, so denominated therein, that it shall be void upon payment of money by the dairy company, whose right to do so was conditioned by keeping the lease in force and by performance of its contract to manufacture the war materiel mentioned. Both the contract and the deed refer to the title conveyed by the dairy company to the government as a *defeasible* one. This is plain from the clause that the title vested in the government shall become *indefeasibly* vested in it upon the dairy company's default. The covenants binding the dairy company to repair, to insure, and to pay taxes are such as are ordinarily included in a mortgage or a contract for deed. If an absolute sale as distinguished from a mortgage was intended, the covenant binding the dairy company to pay taxes was just so much surplusage and consequently meaningless. In case of an absolute sale, the property would have been immune from state taxes, and, consequently, federal governmental immunity from state taxation without the covenant would have afforded the federal government adequate protection against the taxes in question. If, however, a mortgage was intended, the property was subject to state taxation (see *infra*); and in that event a covenant such as we have here was necessary to afford the government protection against such taxes. The covenant can be given effect only by holding that a mortgage was intended. The fact that such a covenant was made is a token of intention to mortgage rather than to convey absolutely and indefeasibly. It seems clear also that the government intended to advance to the dairy company the money necessary to construct

and to equip the facility and to hold title thereto as security for the money advanced and the dairy company's performance of the contract; that the government did not intend to acquire the facility to hold it permanently; and that, when the purposes of the government had been achieved, it intended to return the facility to the dairy company upon payment of the balance of the money due. While the language of the condition subsequent is not that the deed shall become *void* upon the happening of the condition, but is rather that upon the happening thereof the title acquired under the deed shall "revert" to the dairy company, the language of the condition is equivalent to a declaration that upon the happening thereof the deed shall become void. The word "revert," as used in the condition subsequent, means that upon performance of the condition title shall go back to the dairy company. See, Bybee v. Oregon & California R. Co. 139 U. S. 663, 11 S. Ct. 641, 35 L. ed. 305; Reaney v. Wall, 134 Conn. 663, 60 A. (2d) 505. That, of course, means that then the deed shall become void. It is expressive of mortgaging as we defined it in Palmer v. Mutual L. Ins. Co. 114 Minn. 1, 6, 130 N. W. 250, 252, Ann. Cas. 1912B, 957, where we said:

"* * * A chattel mortgage is a present transfer of title to the mortgaged property, with a defeasance. Upon the payment of the debt or the performance of the obligation secured, the title to the property *reverts* to the mortgagor." (Italics supplied.)

To the same effect: In re Herkimer Mills Co. Inc. (D. C.) 39 F. (2d) 625.[4] The word *revest* is sometimes used to express the same thought. Comron v. Standland, 103 N. C. 207, 9 S. E. 317, 14 A. S. R. 797; In re Ulrop-Huff Co. Inc. (D. C.) 9 F. (2d) 922 (reinvest).

A sale and lease back, even though there is no provision for defeasance of title upon performance of stipulated conditions, will be treated as a mortgage where it appears that the conveyance was for security for a debt or for the performance of an act. Helvering v.

[4] See, In re A. Roth Co. Inc. (7 Cir.) 118 F. (2d) 156; Pearce v. Wilson, 111 Pa. 14, 2 A. 99, 56 Am. R. 243; Wisconsin Cent. R. Co. v. Wisconsin River Land Co. 71 Wis. 94, 36 N. W. 837.

274

F. & R. Lazarus & Co. 308 U. S. 252, 60 S. Ct. 209, 84 L. ed. 226. See, Cary, *Corporate Financing Through the Sale and Lease-Back of Property: Business, Tax, and Policy Considerations,* 62 Harv. L. Rev. 1; Cary, *Sale and Lease-Back of Corporate Property,* 27 Harv. Bus. Rev. 151.

Whether a transaction between the United States and a war contractor is a mortgage is to be determined by the rules stated. In cases arising under contracts let during World War I, where a transaction was not in the form of a mortgage, but was in substance one as security for the payment of money or the performance of an act, the federal courts held the transaction to be in effect a mortgage. United States v. Shelby Iron Co. 273 U. S. 571, 47 S. Ct. 515, 71 L. ed. 781; Virginia Shipbuilding Corp. v. United States (4 Cir.) 22 F. (2d) 38. The cited cases are not only authority for the application to war contracts of the rules stated for determining whether a particular transaction is a mortgage, but persuasive that the transaction here is in fact such.

We hold that the transaction here is a mortgage under the rules stated.

■ Where the real nature of the transaction is a loan upon the security of real estate, it is a mortgage, even though the loan is made wholly upon the security and without any personal obligation on the part of the borrower. Hewitt v. Baker, 222 Minn. 292, 24 N. W. (2d) 47; 4 Dunnell, Dig. & Supp. § 6154. The Hewitt case reviewed our prior decisions. The dairy company's contention to the contrary cannot be sustained.

■ In determining whether the dairy company's property is clothed with federal immunity from the taxes in question, it is necessary to consider the nature of such taxes.

A real estate tax is one *in rem* against real property without personal liability therefor on the part of the owner thereof, and a judgment recovered in proceedings for the enforcement of such a tax likewise is one *in rem* against the property without personal liability against the owner. Wilking v. County of Chippewa, 225 Minn. 425, 31 N. W. (2d) 437; In re Petition of S. R. A., Inc. 213

Minn. 487, 7 N. W. (2d) 484; State v. Weyerhauser, 68 Minn. 353, 71 N. W. 265; 6 Dunnell, Dig. §§ 9114a, 9281, 9353.

A personal property tax is not one upon such property, but rather one *in personam* against the owner because of his ownership of such property and measured by the value thereof. In re Petition of S. R. A., Inc. *supra;* State ex rel. Vossen v. Eberhard, 90 Minn. 120, 95 N. W. 1115; 6 Dunnell, Dig. & Supp. § 9263. As said in State ex rel. Vossen v. Eberhard, 90 Minn. 123, 95 N. W. 1116, *supra:*

"* * * The proceeding for the collection of taxes upon personal property is one in personam, and not in rem. This radical distinction must be kept in mind: In the one case the tax is against the person, although estimated in amount according to the value of the personal property possessed, and is never a lien upon the property assessed; in the other the tax is against the land, and becomes a lien thereon, but is never made a personal obligation against the owner. The state has no claim upon the personal property assessed, and it may be disposed of by the owner without regard to its assessment for taxes."

While personal property taxes are not a tax upon property and the tax is imposed upon the owner thereof *in personam,* such taxes are, by virtue of M. S. A. 272.50, a lien upon the property, because of which the owner is taxed. Both real and personal property taxes are nondiscriminatory. See, Minnesota v. Blasius, 290 U. S. 1, 54 S. Ct. 34, 78 L. ed. 131.

■ Facts stated in the trial court's memorandum made part of its decision, which are not inconsistent with facts specifically found, become part of the findings (Wilson v. Davidson, 219 Minn. 42, 17 N. W. [2d] 31), and if unchallenged or if supported by the evidence are final on appeal (Sime v. Jensen, 213 Minn. 476, 7 N. W. [2d] 325). Likewise, findings and conclusions not assigned as error on appeal are final. In re Estate of Olson, 227 Minn. 289, 35 N. W. (2d) 439; Alexander Pickering & Co. v. Chinese American C. S. Assn. (9 Cir.) 71 F. (2d) 895. So here, the statements in the memorandum made part of the trial court's decision in the injunction case, to the

effect that the transaction between the government and the dairy company was a mortgage and that the rights acquired by the state in the proceedings to enforce payment of the real estate taxes were "subordinate" to those of the government in the real estate, are to be taken here as final. They are not only not inconsistent with the facts specifically found and the conclusions made, but they also explain why such specific findings and the conclusions were made.

■ A state may constitutionally impose a nondiscriminatory tax upon the interest of a mortgagor in land, the legal title to which is held by the United States as mortgagee, so long as the rights of the United States remain unaffected. S. R. A., Inc. v. Minnesota, 327 U. S. 558, 66 S. Ct. 749, 90 L. ed. 851 (affirming In re Petition of S. R. A., Inc. 219 Minn. 493, 18 N. W. [2d] 442; 219 Minn. 517, 18 N. W. [2d] 455). There, the question was whether the interest of a vendee under a contract to purchase real estate from the government was immune from a real estate tax imposed by this state, where the interests of the government were unaffected by the tax. It was there held that the purchaser, as vendee, was the equitable owner of the land; that the government, as vendor, held the legal title only as security for performance of the contract by the vendee; and that the relation of the parties was in substance the same as that existing between a mortgagor and mortgagee. In the second S. R. A. case we said (219 Minn. 515, 18 N. W. [2d] 454):

"Any difference between a security right obtained under a mortgage and that provided for by the retention of the legal title under an executory sales contract is a matter of form only and not of substance."

We in effect so held in the first S. R. A. case (213 Minn. 487, 7 N. W. [2d] 484).

The Supreme Court of the United States adopted this view. After pointing out that such a tax did not "impinge" upon federal rights, the court said (327 U. S. 566, 569, 66 S. Ct. 754, 756, 90 L. ed. 858, 860):

"* * * The possibility of repossession by the United States is not enough to block a tax sale in which the paramount rights of the United States are protected."

and—

"* * * Where beneficial interest has passed to a vendee, the retention of legal title does not give a significant difference from the situation of a deed with a lien retained or a *mortgage* back to secure the purchase money." (Italics supplied.)

Here, because the transaction is in fact a mortgage, it comes squarely within the reasons for the rule announced by both the Supreme Court of the United States and by us in the S. R. A. cases.

It makes no difference that the mortgagee or vendee has not paid the money due to the United States or demanded a deed. It is sufficient for present purposes at least that he has a right to do so upon making payment, even though he has not done so. S. R. A., Inc. v. Minnesota, 327 U. S. 558, 66 S. Ct. 749, 90 L. ed. 851, *supra,* citing City of New Brunswick v. United States, 276 U. S. 547, 48 S. Ct. 371, 72 L. ed. 693.

The fact that the property is "owned by a private person and used by him in performing services for the Federal Government" does not render it immune from nondiscriminatory state ad valorem taxes. Oklahoma Tax Comm. v. Texas Co. 336 U. S. 342, 350, 69 S. Ct. 561, 566, 93 L. ed. (Adv. Sheets) 556, 561.

The fact that the entire real property was assessed for the tax is no ground for holding that the property is immune from the tax upon federal grounds. This contention was answered by the Supreme Court of the United States in the S. R. A. case in the following language (327 U. S. 570, 66 S. Ct. 756, 90 L. ed. 860):

"The only other contention of petitioner which we need mention is that the State has included the interest of the United States in the valuation of the land, and has therefore subjected that interest to taxation. But no deduction need be made for the interest of the Government since that interest is for security purposes only and is

not beneficial in nature. The whole equitable ownership is in the petitioner and the value of that ownership may be ascertained on the basis of the full value of the land."

The dairy company cites contra, among other cases, those of Van Brocklin v. Tennessee, 117 U. S. 151, 6 S. Ct. 670, 29 L. ed. 845, and United States v. County of Allegheny, 322 U. S. 174, 64 S. Ct. 908, 88 L. ed. 1209 (commonly known as the Mesta case). These cases are not in point. The Supreme Court of the United States distinguished both of them in the S. R. A. case (327 U. S. 567, 66 S. Ct. 755, 90 L. ed. 858-859). We distinguished the Mesta case in the S. R. A. case (219 Minn. 496, 18 N. W. [2d] 445). We do not deem it necessary to repeat here what was there so well said.

It follows here that the dairy company's interest in the property taxed (real estate) is not immune from state taxation upon grounds of federal immunity. The tax in question is nondiscriminatory. Being subordinate to the rights of the federal government, it neither affects nor impinges upon them. See, In re Petition of S. R. A., Inc. 219 Minn. 493, 18 N. W. (2d) 442, and *Id.* 213 Minn. 487, 7 N. W. (2d) 484, *supra.*

■ Personal property taxes, being only in personam and not against the property, have no effect upon the property, except where the state attempts to enforce its lien therefor against the property. The taxpayer's tax liability and the state's lien rights against the particular property involve separate questions. At this stage of the proceedings, only the liability of the taxpayer for the tax is involved. Since the tax may be collected out of the taxpayer's other property, it may never become necessary to resort to the property on the ownership of which the tax is based. The question is whether one using property, upon which the government holds a mortgage, to serve the government is immune upon federal grounds from a personal property tax imposed upon him in personam. We think that this question is answered emphatically in the negative by the

Oklahoma Tax Comm. case, *supra*, and the numerous decisions. of the Supreme Court of the United States there cited.[5]

■ No reason occurs to us why the judgment in the declaratory judgment action, that the dairy company is liable for the personal property tax notwithstanding its claim of federal immunity therefrom, is not *res judicata* here of its liability for such tax. We hold that it is. The fact that the declaratory judgment determined a federal question does not render it any less a bar. Angel v. Bullington, 330 U. S. 183, 67 S. Ct. 657, 91 L. ed. 832; Baldwin v. Iowa State Traveling Men's Assn. 283 U. S. 522, 51 S. Ct. 517, 75 L. ed. 1244.

In conclusion, we hold that the dairy company's interest in the land is subject to the real estate tax in question and that it is liable in personam for the personal property tax in question. We reach this conclusion without considering whether the dairy company's covenant to pay taxes created such a liability. The liability is independent of the covenant. This disposes of the questions raised on the appeals. It follows that there should be an affirmance in both cases.

Affirmed.

---

[5]See, Penn Dairies, Inc. v. Milk Control Comm. 318 U. S. 261, 63 S. Ct. 617, 87 L. ed. 748, where it was held that milk, produced in Pennsylvania for use by the armed forces during World War II and purchased under war procurement contracts, was not exempt from local regulation of the business of producing milk.