Mary J. GILLILAND, et al., Appellants,

Vi Palo, Plaintiff,

v.

PORT AUTHORITY OF the CITY OF ST. PAUL, Respondent,

Clayton G. Rein, individually, and as Agent for C. G. Rein Company, etc., et al., Respondents.

No. 48560.

Supreme Court of Minnesota.

June 16, 1978.

Martha Eaves and George Rehm, Legal Assistance of Ramsey County, St. Paul, for appellants.

Harriet Lansing, City Atty., Jerome Segal and Robert O. Straughn, Asst. City Attys., St. Paul, for Port Authority, City of St. Paul.

Larkin, Hoffman, Daly & Lindgren, James P. Miley, James P. Strother, James P. Larkin, Minneapolis, for Clayton G. Rein.

## PER CURIAM.

■ Twenty-two tenants and former tenants of the Capri Hotel in St. Paul seek to enjoin construction activity at the Capri and to halt threatened evictions until their claims to relocation assistance under the Minnesota Uniform Relocation Act ("M.U.R.A."), Minn.St. 117.50, et seq., can be judicially determined.[1] They appeal from the order of the Ramsey County District Court of January 25, 1978, denying their motion for injunctive relief. Because of our concern over the problem presented, we expedited the appeal, and heard and considered the case en banc. Even so, appellant tenants concede that the intervening displacement of all but three of the original Capri Hotel residents has made the requested relief, an injunction against further construction, unrealistic and unnecessary to the resolution of their remaining claims.

The tenants, predominantly older persons, age 60 and over, and disabled persons, had rented furnished rooms in the Capri Hotel on a month-to-month basis over periods of several years. On July 15, 1977, they received written notice from the C. G. Rein Company, the owner of the building, that it would begin major renovation of the Capri, now called Seventh Place Residence. The notice stated that the rental agreements for the specific rooms then occupied would not be renewed after August 31, 1977, but residents would be permitted to stay on after September 1, 1977, if they agreed to move to other rooms as the renovation work pro-

---

1. Minn.St. 117.52 provides in part: "In all acquisitions undertaken by any acquiring authority and in all voluntary rehabilitation carried out by a person pursuant to acquisition or as a consequence thereof, in which, due to the lack of federal financial participation, relocation assistance services, payments and benefits under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 84 Stat. 1894 (1971), 42 United States Code, Section 4601, et seq., are not available, the acquiring authority, as a cost of acquisition, shall provide all relocation assistance, services, pay-

ments and benefits required by the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 and any regulations adopted pursuant thereto * * *."

In turn, the Federal act provides for moving and related expenses, 42 U.S.C.A., § 4622, replacement housing economic assistance, 42 U.S.C.A., § 4624, and relocation assistance advisory services, 42 U.S.C.A., § 4625, details of which are described in administrative regulations effective March 31, 1975. 24 CFR, § 42, et seq. (Rev.1977).

gressed. Appellants continued to pay monthly rent and received no further communication until the "notice to vacate" of November 30, 1977. This notice announced that renovation and construction would commence immediately and that tenants must vacate within 30 days.

Legal Assistance of Ramsey County raised objections on behalf of the tenants. In a meeting between the parties, held December 12, 1977, Rein offered to ameliorate the effects of the displacement but refused to permit occupancy of the rooms after December 31, 1977. Twenty-three of the thirty-nine long-term residents joined in an action on December 21, 1977, to enjoin rehabilitation and displacement. On December 23, 1977, Ramsey County District Court denied their motion for a temporary restraining order to halt construction activity, but ordered defendants to continue to provide comparable accommodations within the building to plaintiff-tenants while rehabilitation and litigation continued.

On January 17, 1978, the motion for a temporary injunction was heard. The tenants, by affidavit and expert testimony, offered evidence of their age and physical conditions and the emotional and physical consequences of abrupt and uncounselled relocation, particularly during the winter months. Evidence submitted by respondent C. G. Rein indicated that a construction delay would be costly and could jeopardize agreements with subcontractors and, thereby, the success of the project. The trial court weighed the relative harms to the parties, found both to be serious, and accordingly turned to a consideration of the tenants' likelihood of success on the merits.[2] In the memorandum accompanying its order, the court stated:

**2.** As recently as *Shaffer v. Brooklyn Park Garden Apts.,* Minn., 250 N.W.2d 172, 181 (1977), this court discussed, " * * * five factors to be considered by an appellate court in deciding whether to reverse or affirm the grant or denial of temporary injunctive relief by a trial court. The following considerations were held to be relevant: (1) the nature and background of the relationship between the parties pre-existing the dispute giving rise to the request for relief; (2) the harm to be suffered by the plaintiff if the temporary restraint is denied as compared

*"Likelihood of Success*

" * * * The plaintiffs contend that Minnesota Statute 117.50 requires relocation benefits to the plaintiffs by virtue of the fact that the Capri Hotel was an 'acquisition' within the meaning of Minnesota Statute 117.54, Subd. 4. [sic].

"Minnesota Statute 117.50 through .56 is a portion of the eminent domain statute of this state. This statute requires relocation benefits for any displaced person whose property is acquired by a public body which has the power of eminent domain. The plaintiffs contend that since the renovation of the Capri Hotel is being financed by industrial revenue bonds of the Port Authority that there is an acquisition within the meaning of this statute.

"An examination of Minnesota law relative to this case is necessary. Under Minnesota law a sale and a leaseback will be treated as a mortgage where it appears that the conveyance was for security for a debt or for the performance of an act. The case of *Land O Lakes Dairy Company v. Wadena County,* 229 Minn. 263, 39 N.W.2d 164 (1949), is very illustrative of this situation. In the *Land O Lakes* case the dairy company entered into an agreement with the United States Government whereby the company acquired land and erected a building thereon. The company conveyed title to the U. S. Government for a purchase price to be determined in a manner provided by the contract with the provision that title would revert to the company upon the payment of the purchase price and other

to that inflicted on the defendant if the injunction were to issue pending trial; (3) the likelihood that one party or the other would prevail on the merits when the fact situation is viewed in light of established precedents fixing the limits of equitable relief; (4) the aspects of the fact situation, if any, which permit or require consideration of public policy expressed in state and Federal statutes; and (5) the administrative burdens involved in judicial supervision and enforcement of the temporary decree."

conditions. The question before the Court in the *Land O Lakes* case was the duty of the dairy company to pay real estate taxes. The Minnesota Court held that under the circumstances the arrangement with the dairy company and the United States Government was a sale and a leaseback, and in effect a mortgage, and therefore the dairy company was subject to Minnesota taxes.

"It should be pointed out that the Port Authority in this case in issuing industrial revenue bonds has done this quite frequently in St. Paul. It has provided over ten million dollars for an addition to St. Joseph's Hospital. It has subscribed many millions for the building of the new United Hospitals. Over three and a half million dollars has been set up in revenue bonds for the new Amtrack station in the Midway area. Over three million dollars has been issued in revenue bonds for the conversion of the downtown Lowry Hotel into an apartment complex. These are but a few of the instances where the Port Authority has issued industrial revenue bonds. In each instance it is clear that the issuance of the bonds by the Port Authority is a security arrangement and is not an exercise of eminent domain by the Port Authority, and therefore cannot be considered an acquisition within the meaning of Minnesota Statute 117.50.

"It therefore appears to this Court that the plaintiffs have almost no likelihood of success for a permanent injunction in this case."

The determination of whether the transaction involved here constituted an "acquisition" within the meaning of Minn.St. 117.-50 cannot be made simply by finding that the Port Authority did not exercise its power of eminent domain.[3]

Minn.St. 117.50, subd. 4, defines "acquisition" as follows:

" 'Acquisition' includes:

(a) acquisition by eminent domain;

(b) acquisition by negotiation;

(c) programs of areawide systematic housing code enforcement, and

(d) demolition."

We are concerned only with transactions included in clause (b) but must give consideration to the entire subdivision since clauses (c) and (d) describe acts outside the usual meaning of "acquisition".[4]

■ Webster's Third New International Dictionary (1976) p. 18 defines "to acquire" as "to come into possession, control, or power of disposal," and Black's Law Dictionary (Rev. 4 ed.) defines "acquisition" as "[t]he act of becoming the owner of certain property * * *." In *Clarno v. Gamble-Robinson Co.*, 190 Minn. 256, 259, 251 N.W. 268, 269 (1933), we construed the term "acquire" in an automobile insurance policy to mean "to get as one's own." The United States Supreme Court has stated, in reference to the revenue acts, that "[t]he word 'acquired' is not a term of art in the law of property but one in common use. The plain import of the word is 'obtained as one's own'." *Helvering v. San Joaquin Fruit & Investment Co.*, 297 U.S. 496, 499, 56 S.Ct. 569, 570, 80 L.Ed. 824, 826 (1936). That the word "acquisition" as used in Minn.St. 117.-50, subd. 4(b), is to have the meaning adopted by these authorities is supported by its use in reference to eminent domain. When that power is exercised, the governmental body obtains full right to use the property as its own, consistent with the purposes for which the power is granted. See *Buck v. City of Winona*, 271 Minn. 145, 135 N.W.2d 190 (1965).

■ When "acquisition" is given its common meaning, it becomes clear that the

---

**3.** Minn.St. 117.52 provides that if federal relocation assistance is not available, the acquiring authority shall provide certain relocation assistance "[i]n all acquisitions undertaken by any acquiring authority and in all voluntary rehabilitation carried out by a person pursuant to acquisition or as a consequence thereof * * *."

**4.** Minn.St. 645.08 provides in part: " * * * (1) Words and phrases are construed according to rules of grammar and according to their common and approved usage; but technical words and phrases and such others as have acquired a special meaning, or are defined in this chapter, are construed according to such special meaning or their definition * * *."

transaction involved in this case was not an "acquisition by negotiation." C. G. Rein/C. G. Rein Construction Co., the defendant-owner of the Capri, secured financing for the hotel renovation through the issuance of industrial revenue bonds by the Port Authority of the City of St. Paul. The Port Authority obtained fee simple title to the hotel, and the owners received the bond sale proceeds. The Port Authority contemporaneously leased the hotel back to its former owners under a 30-year lease. At the end of the lease period, fee simple title will revert to Rein upon payment of $1.00. This sale and leaseback arrangement gave the Port Authority no power to possess the hotel or to use it for its own purposes. The authority secured only such rights over the property as were necessary to protect the interests of the bond holders.

 It is well established that the sale portion of a sale and leaseback cannot be considered a separate transaction for tax purposes. *Land O'Lakes Dairy Co. v. County of Wadena*, 229 Minn. 263, 39 N.W.2d 164, affirmed, 338 U.S. 897, 70 S.Ct. 251, 94 L.Ed. 552 (1949); 26 U.S.C.A., § 103(b)(2). We have held that similar transactions where a deed and a contract for deed or an option to purchase are simultaneously exchanged are forms of financing and constitute equitable mortgages. *Albright v. Henry*, 285 Minn. 452, 174 N.W.2d 106 (1970); *Gagne v. Hoban*, 280 Minn. 475, 159 N.W.2d 896 (1968). The exchange of a deed and a long-term lease must be treated in the same manner, especially when title to the property reverts to the lessee upon payment of a nominal sum at the expiration of the lease term. The transaction is purely a financing arrangement and the title simply provides security. To break the transaction into two separate parts, a sale and a lease, would be to distort its real nature and to ignore the intent of the parties.

Had the state legislature intended to provide relocation assistance to persons displaced by private, government-financed rehabilitation projects it could have done so. M.U.R.A. expressly grants assistance where voluntary private rehabilitation results from a systematic program of housing code enforcement. Minn.St. 117.50, 117.52. The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C.A., § 4601, et seq., M.U.R.A.'s Federal counterpart, provides assistance to those displaced by Federally financed state projects, 42 U.S.C.A., § 4630. These provisions were adequate models for the expression of an intent to afford assistance where governmental financing results in displacement. From the legislature's failure to include such a provision in the statute we conclude that relocation assistance is not available where the governmental action causing displacement is solely the financing of a private rehabilitation project.

Affirmed.

WAHL, Justice (concurring in part, dissenting in part).

I concur in the denial of injunctive relief, that issue having been rendered moot by the displacement of the original Capri Hotel residents, but I respectfully dissent from the holding of the majority that the purchase of the subject property with proceeds of industrial revenue bonds issued pursuant to Minn.St. 474.03 by the Port Authority of St. Paul does not constitute an "acquisition" for purposes of the Minnesota Uniform Relocation Act, Minn.St. 117.50, et seq. An examination of M.U.R.A. and its federal complement, the Uniform Relocation Assistance Act, 42 U.S.C.A., § 4601, et seq., clearly indicates a legislative policy that the people displaced by government projects should not bear a disproportionate burden on behalf of the general public welfare. These laws were intended to provide for fair and consistent treatment for businesses, homeowners, and tenants facing dislocation as a consequence of government projects.

In relevant part M.U.R.A. guarantees certain relocation assistance to any person who moves his personal property from real property as a result of voluntary rehabilitation carried out by a person as a consequence of an "acquisition" by an acquiring authority. Minn.St. 117.50, subd. 3, and

117.52. Although Minn.St. 117.50, subd. 4, purports to particularize "acquisition," the definition is circular and ambiguous[1] so that other indicia of legislative intent, and analogous case law under the model Federal act must be considered in deciding whether the transaction in issue is an "acquisition," for purposes of M.U.R.A.

Because of an inability to obtain economical conventional financing, defendant C. G. Rein/C. G. Rein Construction Co., the owner of the Capri Hotel, approached co-defendant Port Authority of the City of St. Paul, a governmental subdivision pursuant to Minn.St. 458.09, et seq., to finance the Capri Hotel renovation through the issuance of industrial revenue bonds. Under this procedure, the Port Authority would obtain fee simple title to the property with the proceeds of bond sales to private parties. The Port Authority would continue to hold title to the property, approve rehabilitation plans, and hold limited supervisory rights and obligations on behalf of the bondholders, but C. G. Rein and Company would remain in actual possession of the property under the terms of a contemporaneous 30 year lease. At the conclusion of the lease term, title would return to Rein, subject to reservation of limited rights, upon payment of $1. It is apparent that for purposes of federal taxation,[2] state taxation,[3] and the law of equitable mortgages,[4] the above transaction would be recognized as a financing arrangement, irrespective of the nominal transfer of title. Those purposes are not in issue here; the question is whether this transaction is within the intended ambit of "acquisition," the threshold issue of M.U.R.A. applicability.

I would find that it is. The power to issue industrial revenue bonds under Minn.St. 474.03, invoked by the Port Authority here, is expressly premised on the public interest in encouraging commerce and preventing general economic deterioration. The bond issuance, favorable interest rates, tax-exempt status, and employment of the auspices and officers of the Port Authority demonstrate a degree of official involvement and economic subsidy in the Capri Hotel project. It is clear from cases arising under the Federal act that not all forms of governmental financial involvement mandate relocation assistance; merely holding or insuring a mortgage does not, for example.[5] In my view, however, the actual acquisition of record title by the Port Authority, as an integral part in a voluntary rehabilitative project undertaken on behalf of the general public welfare, is an "acquisition" as contemplated by the demands of M.U.R.A. I would decline the invitation to restructure the transaction to avoid imposing relocation assistance obligations.

1. " 'Acquisition' includes:
 "(a) acquisition by eminent domain;
 "(b) acquisition by negotiation;
 "(c) programs of area wide systematic housing code enforcement; and
 "(d) demolition." Minn.St. 117.50, subd. 4.

2. See, 26 U.S.C. § 103(b)(2).

3. *Land O'Lakes Dairy Co. v. County of Wadena*, 229 Minn. 263, 39 N.W.2d 164 (1949) affirmed, 338 U.S. 897, 70 S.Ct. 251, 94 L.Ed. 552 (1949).

4. *Albright v. Henry*, 285 Minn. 452, 174 N.W.2d 106 (1970); *Gagne v. Hoban*, 280 Minn. 475, 159 N.W.2d 896 (1968).

5. *Moorer v. Dept. of HUD*, 561 F.2d 175 (8 Cir. 1977) (private development, private mortgage financing, but federally-sponsored interest subsidy payments and mortgage insurance under 12 U.S.C.A., § 1715z–1); *Parlane Sportswear Company, Inc. v. Weinberger*, 513 F.2d 835 (1 Cir. 1975), certiorari denied, 423 U.S. 925, 96 S.Ct. 269, 46 L.Ed.2d 252 (1975) (land acquired by private university which had been receiving substantial research grants from Federal government); *Harris v. Lynn*, 411 F.Supp. 692 (E.D.Mo.1976) affirmed 555 F.2d 1357 (8 Cir. 1977) (public housing project owned and operated by City of St. Louis demolished, with Federal modernization funding); *Jones v. United States Dept. of Hous. & Urb. Dev. (HUD)*, 390 F.Supp. 579 (E.D.La.1974) (demolition to follow sale of housing project from one private developer to another, Federal government was mortgagee).

Minn.St. 474.03(5) explicitly authorizes the Port Authority to hold a mortgage on redevelopment property. The Port Authority's election of the sale and leaseback arrangement, presumably for reasons of bondholder security, should bind it to its consequences under M.U.R.A.

TODD, Justice (concurring in part, dissenting in part).

I join in the dissent of Judge WAHL.

YETKA, Justice (concurring in part, dissenting in part).

I join in the dissent of Judge WAHL.

SCOTT, Justice (concurring in part, dissenting in part).

I concur in the dissent of Justice WAHL.