411 F.Supp. 692 (1976)
Barbara HARRIS et al., Appellant-Plaintiffs,
v.
James T. LYNN, individually and in his official capacity as Secretary, Department of Housing and Urban Development, United States of America, et al., Appellee-Defendants.
No. 74-125c(2).
United States District Court, E. D. Missouri, E. D.
February 9, 1976.
*693 Louis Gilden, Walter Heiser, St. Louis, Mo., for plaintiffs.
Klutho & Cody, St. Louis, Mo., for defendants St. Louis Housing Auth., Thomas P. Costello et al.
Donald J. Stohr, U. S. Atty., Charles W. Kunderer, Asst. City Counselor, St. Louis, Mo., for John H. Poelker and The City of St. Louis.

MEMORANDUM AND ORDER
REGAN, District Judge.
Plaintiffs, former tenants of the Pruitt and Igoe Low Rent Public Housing Projects (Pruitt-Igoe) in St. Louis, claim entitlement for themselves and the class they represent to relocation benefits (aggregating in excess of $12,000,000) under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (Uniform Relocation Act) on the theory they are "displaced persons" as defined in the Act.
The Pruitt-Igoe projects, located on a 57 acre tract acquired by the St. Louis Housing Authority through the power of eminent domain, was constructed by the Authority in the mid-1950s. The Authority is a separate municipal corporation created under Missouri law and existing independently of federal law. The construction of the thirty-two 11-story buildings in the two projects was financed by development loans made by the United States Government through the Public Housing Administration under a program authorized by the United States Housing Act of 1937. The Authority receives annual contributions from the Government to retire the development loan. Fee ownership of the site and improvements has at all times from the date of initial acquisition remained in the Authority.
Unfortunately, due to a number of factors for which blame need not now be assessed, conditions at the project, both physical and financial, went from bad to worse. The occupancy rate steadily and dramatically declined, with the inevitable result of a severe financial strain on the Authority and an increasingly larger deficit budget adversely affecting the Authority's ability to adequately maintain others of its projects which were financially healthy. In September, 1970, the Authority initiated a consolidation program, the purpose of which was to reduce the number of occupied buildings and increase the percentage of occupancy of the remaining buildings. However, it became apparent that the consolidation program was "too little, too late" to enable the Authority to continue the operation of the projects. In the meantime, hundreds of thousands of dollars had been expended by the Authority in various efforts to salvage the projects.
In June, 1973, when approximately 600 tenants remained in the projects, the Authority decided that it had no alternative to closing down the projects completely, terminate the tenancies of the remaining tenants and move them into other public housing units. With the concurrence of the Department of Housing and Urban Renewal (HUD), this decision was implemented, and the projects were closed down. After effecting the relocation of the tenants from what had been characterized as a "human disaster area" to other public housing (and in some instances, at the option of the tenant, to other housing) the vacant buildings were demolished with "Modernization" funds provided by HUD. Moving costs, not *694 to exceed $250 per tenant, were provided by the City of St. Louis.
With this brief background, we consider plaintiffs' claims.
The Uniform Relocation Act provides for substantial cash payments and other benefits to "displaced persons." The declared purpose of the Act is "to establish a uniform policy for the fair and equitable treatment of persons displaced as a result of Federal and federally assisted programs in order that such persons shall not suffer disproportionate injuries as a result of programs designed for the benefit of the public as a whole."[1]
The basic controverted issue is whether plaintiffs qualify for the benefits as "displaced persons." The term is defined in Section 4601(6), 42 U.S.C., as follows:
"The term `displaced person' means any person who, on or after January 2, 1971, moves from real property, or moves his personal property from real property, as a result of the acquisition of such real property, in whole or in part, or as the result of the written order of the acquiring agency to vacate real property, for a program or project undertaken by a Federal agency, or with Federal financial assistance; * * *."
In addition, Section 4637, 42 U.S.C., provides that a person who moves from his dwelling "as a direct result of any project or program which receives Federal financial assistance under title I of the Housing Act of 1949, as amended, or as a result of carrying out a comprehensive city demonstration program under title I of the Demonstration Cities and Metropolitan Development Act of 1966" shall for the purposes of the Uniform Relocation Act be deemed to have been displaced as the result of the acquisition of real property.
We hold that under the evidence, plaintiffs are not "displaced persons" within the meaning of any of the factual situations set forth in Sections 4601(6) and 4637. We consider these in order in light of plaintiffs' contentions.
Under any realistic view of the evidence, plaintiffs were not displaced "as a result of the acquisition" of the property, for a program undertaken with Federal financial assistance or by a Federal agency. When the Authority acquired the property in 1951, with federal financial assistance, no one was displaced other than any individuals who may then have been residing on the site. And certainly, plaintiffs were not displaced "as a result" of the 1951 acquisition by the Authority.
Plaintiffs argue that in any event, the project property was "acquired" by the federal government by virtue of two Declarations of Trust duly executed and recorded by the Authority. By these Declarations of Trust, the Authority acknowledged that it was possessed of and held the property in trust for the benefit of the Public Housing Administration (PHA), the predecessor of HUD, and the holders of the bonds issued pursuant to the Annual Contributions Contract between the United States and the Authority, until all indebtedness of PHA under the Contract and all bonds have been fully paid. The interest granted to PHA and the bondholders, as set forth in the Declarations, consists of certain "rights," such as the right to require the Authority to retain the unencumbered title to the property and its income.
It is plaintiffs' theory that under controlling Missouri law, as applied to the Declarations of Trust, the federal government became the equitable or real owner of the property, with the Authority holding only the bare legal title. Plaintiffs misread the cases cited, e. g., Porter v. Woods, 138 Mo. 539, 39 S.W. 794, 797. In the Porter case, the Missouri Supreme Court defines a declaration of trust as "the act by which an *695 individual acknowledges that property the title to which he holds in his own name in fact belongs to another, for whose use he holds it." We find no such acknowledgement in the Declarations of Trust here involved. There is no language therein which directly or indirectly acknowledges or declares that the project property in fact belongs to the federal government. The mere fact that the parties choose to call an instrument a declaration of trust does not of itself operate to effect a transfer of the equitable or real ownership.
Without regard to the foregoing, and even assuming, as plaintiffs argue at length, that by concurring in the Authority's decision to move plaintiffs out of the projects HUD was implementing what it considered to be "important federal policy," the fact remains that plaintiffs were not displaced as a result of the government's alleged 1955 "acquisition" of ownership. Plaintiffs argue that to deny relocation benefits to individuals forced to move from "federal" lands while granting such benefits to those displaced as a result of the "acquisition" of such lands would run counter to the Congressional purpose and intent. It is clear to us, however, that Congress advisedly limited the eligible class (in Section 4601(6)) to those forced to move as a result of an "acquisition." There are, for example, a number of references in the Act to "acquisition" and "acquiring agency." Of importance, also, in this connection as evidencing Congressional intent, is Section 4637 as well as uncodified Section 219 of the Act.
Section 4637, in carefully chosen language, provides that in the instances therein enumerated, a person who moves from his dwelling shall "be deemed to have been displaced as the result of the acquisition of real property." Thus it is evident that "acquisition" is the key word. And in uncodified Section 219, tailor-made to fit a factual situation in a particular area of New York City, benefits were accorded to tenants who had leased the property after its acquisition by the government for ultimate construction of a postal facility. We add that our reading of the Act is buttressed by its legislative history.
A related contention of plaintiffs is that the Authority was in "substantial default" under the Annual Contributions Contract as of August 23, 1973, when the decision to close the projects was approved, by breaching the requirement that it operate the projects to provide decent, safe and sanitary dwellings. Plaintiffs argue that the Contract required HUD to either obtain title to or possession of the property upon the occurrence of the "default," and so, perforce the Contract and the Declarations of Trust, the Authority had a "defeasible" fee simple estate and "HUD had a shifting executory interest in fee vesting upon the defeasibility of the Housing Authority's interest." No authority is cited to support plaintiffs' theory that upon the mere occurrence of the assumed default, without more, fee simple title automatically is vested in HUD. So, too, inasmuch as the Authority's decision to close down the projects was approved by HUD, the other party to the contract, (approval which was necessary because of the existing contractual obligations to bondholders), there could not realistically be a "breach" of the Authority's obligation to operate the projects.
We turn next to plaintiffs' contention, based on Section 4637, that they were displaced either as a result of carrying out a comprehensive city demonstration program under Title I of the Demonstration Cities and Metropolitan Development Act of 1966 (Model Cities Act) or as a direct result of a project receiving federal assistance under Title I of the Housing Act of 1949, as amended.
Suffice it to say, as to the latter, that there is no evidence whatever that the residents of Pruitt-Igoe were moved as a direct result of any project or program receiving Federal financial assistance under Title I. For example, the Pruitt-Igoe projects are not located within the boundaries of an urban renewal project or a neighborhood development program area, nor has any application for funds to demolish the *696 Pruitt-Igoe project pursuant to Title I been made. In fact, for good and sufficient reasons, the funds for the demolition of the projects have been authorized out of those appropriated for the Low Rent Public Housing Modernization Program as provided for under the Housing Act of 1937. In spite of plaintiffs' argument that by using modernization funds instead of funds appropriated under Title I of the Housing Act of 1949, HUD "defrauded" them out of Relocation Assistance benefits (a contention with which we do not agree under the evidence), there can be no question but that only the receipt of 1949 Title I funds triggers eligibility under this portion of Section 4637.
We are also convinced that plaintiffs' displacement did not result from carrying out a comprehensive city demonstration program. The Model Cities Act authorizes grants to eligible cities for the preparation and carrying out of a comprehensive city demonstration program for a relatively large blighted or deteriorating area of a city. The City of St. Louis, by ordinance, established a Model City Agency which annually prepared and submitted to HUD on behalf of the City an action plan application for each year for model cities' funds.
As submitted to HUD, each annual action plan lists each of the activities proposed to be carried out by the Model City Agency or other operating agency funded by it, including a cost breakdown specifically designating the portion to be paid from the Model Cities' fund. The various program costs are further subdivided to components such as personnel, supplies, services, etc. Upon HUD's review and approval of the annual plan submitted by the Agency, the Board of Aldermen of St. Louis would then specifically authorize by ordinance each separate action project constituting the annual program. The specified annual projects so submitted to and approved by HUD, and adopted by city ordinance, constitute the City's "comprehensive city demonstration program" for the particular year.
The comprehensive city demonstration programs for the 2nd, 3rd, and 4th action years, beginning with the second action year (1971-1972) provided a number of "soft-ware" programs to the residents of the Model City's area which included the Pruitt-Igoe Projects area. These soft-ware programs, such as Day Care, Outreach, Senior Citizens, and Health Services, were entirely service oriented. Each of these programs was specifically mentioned in each action plan for which federal funding was requested, including an estimate as to the cost of the program and an allocation of federal funds. No "hard-ware" project (including destruction or demolition of the Pruitt-Igoe Projects) was ever programmed or requested by the Model City Agency to HUD for funding.
On December 23, 1970, the City submitted to HUD a copy of the program for Action Year II. This second action year plan contained a request, as a component of the Program Administration Budget, for $50,000 to be used for consultant services for management training and planning. Subsequently, in early 1971, HUD requested the Model City Agency to develop a land use plan to assist the Agency in its preparation of the annual action plan or comprehensive city demonstration program. It was felt by HUD that a land use guide should be available to the Agency in order to avoid the planning of programs which might conflict with recognized planning principles such as using sites for housing contiguous to heavy industrial sites.
Thereafter, the City Plan Commission, an agency of the City of St. Louis, prepared a Model City Land Use Plan in June, 1972, for the total model city areas. Planning assistance was secured by a consultant contract funded by Model City Agency utilizing a portion of the funds from the Program Administration Budget. The consultant, in cooperation with the City Plan Commission, prepared a land use plan which included separate sections on each of the five Model City neighborhoods.
At the time the Commission was preparing its proposed land use plan a Pruitt-Igoe Task Force was studying Pruitt-Igoe in an attempt to develop proposals to resolve the *697 problems it posed. This Task Force, funded by HUD out of monies appropriated for the Low Rent Housing Modernization program under the Housing Act of 1937, consisted of representatives of HUD, the City of St. Louis and the Authority. A consulting firm of architects and engineers prepared an in-depth study which it submitted to the Task Force. The final report as issued by the Task Force listed seven conclusions concerning the Pruitt-Igoe projects centering basically on their rehabilitation, partial demolition and redevelopment. The report contained a recommendation that if the supporting programs it suggested were not implemented, then Pruitt-Igoe should be completely demolished and the tenants be relocated in rent supplement or turnkey locations in the St. Louis area.
After the final report was issued, HUD provided additional modernization funds under the 1937 act to enable the Authority to conduct experimental demolition projects. Three of the structures which had been vacant since 1970 were demolished in order to determine the feasibility of changing structure density and site density as well as the cost of completely demolishing an entire building.
The proposed Model City Land Use Plan (which contains the statement that "The Model City Land Use Plan incorporates the recommendations developed by the Pruitt-Igoe Task Force") was approved by the Board of Directors (the citizen participation unit) of Model City Agency. However, the City of St. Louis did not by ordinance or otherwise adopt the land use plan as a change or amendment of the existing comprehensive plan for the physical development of the City or any component thereof. Subsequent to its approval by the Model City Agency, none of the recommendations made by the land use plan was ever submitted by the Agency as part of any annual action year or comprehensive city demonstration program. And by reason of the fact that the Agency was locked into "software" projects because of the limited life of the city demonstration program, the land use plan was abandoned as a useful tool and not utilized by the Agency.
At no time subsequent to the completion of the land use plan did the Model City Agency ever request any funds for the demolition or redevelopment of the Pruitt-Igoe projects as proposed in the Task Force report. No funds were ever requested by the Model City Agency nor have any been made available to it by HUD for the demolition of the Pruitt-Igoe projects.
In our judgment, the mere fact that the "recommendations developed by the Pruitt-Igoe Task Force" were "incorporated" into the land use plan without any further action or implementation thereof does not suffice to create liability on the theory that simply because of the subsequent demolition of the projects such demolition was "carrying out" a comprehensive city demonstration program. It is clear to us that the land use plan, which was developed as a response to a request for a planning tool to avoid inconsistent uses, was not nor was it intended to be incorporated as a funded program activity under the various action year programs. The Model City Agency at no time, either prior or subsequent to the creation of the land use plan, ever negotiated, either with the Authority, the City, or any other agency, with respect to the demolition of the Pruitt-Igoe structures. There is no showing that the Agency ever intended to include either the partial or complete demolition of the Pruitt-Igoe Projects as either a short or long range component of a city comprehensive demonstration program.
The ultimate demolition of the buildings, under the facts here in evidence, was not the "carrying out of a comprehensive city demonstration program." The removal of plaintiffs resulted from the decision of the Authority, based on financial considerations, to cease operation of the projects, a decision which was not contingent upon any decision as to the future use to be made of the site or the buildings.
Having found that plaintiffs were not displaced as a result of the "acquisition" of *698 Pruitt-Igoe, nor as the result of activities carried out under Title I of the 1949 Housing Act or the Demonstration Cities and Metropolitan Development Act of 1966 which could have triggered the application of the Uniform Relocation Act, it follows that plaintiffs are not entitled to recover.
This memorandum constitutes our findings of fact and conclusions of law. Judgment will be entered in favor of defendants.
NOTES
[1] We note, however, there is no language in the Uniform Relocation Act, specifically evidencing a Congressional purpose to grant the substantial financial and other benefits to individuals who are relocated from a grossly substandard public housing project to other, much more decent, safe and sanitary, public housing units.