Juanita MOORER et al., Plaintiffs,

v.

The DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT et al., Defendants.

No. 75 CV 255–W–1.

United States District Court, W. D. Missouri, W. D.

July 28, 1976.

J. D. Riffel, Legal Aid and Defender Society, Kansas City, Mo., for plaintiffs.

Bert C. Hurn, U. S. Atty., Mary Schneider, Asst. U. S. Atty., Thomas P. McNally, Regional Counsel of Housing and Urban Development, Gordon D. Gee, Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, Mo., for defendants.

## MEMORANDUM AND ORDER

JOHN W. OLIVER, District Judge.

### I.

This case presents the question of whether the Uniform Relocation Assistance and Real Property Acquisition Policies Act [URA], 42 U.S.C. § 4601 et seq., covers displacement of persons resulting from the acquisition of property by a private developer under a program or project sponsored by the Department of Housing and Urban Development [HUD].

In their complaint plaintiffs, individually and on behalf of a class of persons similarly situated, allege that they are resident tenants of several apartment buildings in Kansas City, Missouri. They further allege that they were notified by defendant American Development Corporation that they would have to vacate the premises on account of rehabilitation work to be done under Project Rehab, a program sponsored by defendant HUD to rehabilitate dilapidated inner-city dwellings.[1] Plaintiffs also assert that, although they have received or will receive some relocation assistance, they are entitled to the full benefits and services provided under the URA. Plaintiffs seek declaratory and injunctive relief establish-

---

1. The other defendants listed in the complaint include Carla A. Hills, Secretary of HUD; William R. Southerland, the HUD Area Director; Kenwood Apartments, a California limited partnership; James E. Thompson, Operations Officer of American Development Corp.; and Westport Cooperative Mission, Inc., [WCMI], the agency that assisted in relocating plaintiffs. Plaintiffs have voluntarily dismissed their claims against defendant Thompson and WCMI. In addition, the remaining parties have

ing their entitlement to relocation services and benefits under the URA.[2]

■ Jurisdiction is asserted under various federal statutes including 28 U.S.C. §§ 1331, 1336, 1343(3) and (4), 1346(a)(2), 2201, 2202, and Section 10 of the Administrative Procedure Act, 5 U.S.C. §§ 701–06. We find and conclude that judicial review of agency action is proper here. *Tullock v. State Highway Commission,* 507 F.2d 712 (8th Cir. 1974); *Lewis v. Brinegar,* 372 F.Supp. 424 (W.D.Mo.1974).

■ Plaintiffs seek to represent all persons similarly situated "who have been or will be displaced by those phases of Project Rehab sponsored by defendant American Development Corporation, and denied assistance, services, benefits and rights provided by the Uniform Relocation Act [URA]."[3] It is undisputed that at least 450 individuals and families who were occupying the various apartment buildings involved in American Development's phase of Project Rehab in issue here have been displaced. We find that the proposed class is so numerous that joinder of all members is impracticable. We further find that the question of basic entitlement to URA benefits is common to all members of the class and that the claims of each of the representative parties are typical of the class. We find also that the representative parties are represented by experienced and able counsel and will fairly and adequately pro-

tect the interests of the class. Finally, we find and conclude that the action is properly maintainable as a class action for injunctive and declaratory relief under Rule 23(b)(2), Fed.R.Civ.P.

The parties in this case have agreed to submit the question of plaintiffs' entitlement to URA benefits on a stipulated record. On August 14, 1975, a stipulation of fact was filed together with a stipulation of documents that could be considered by the Court. Thereafter, plaintiffs and defendant HUD filed cross-motions for summary judgment.[4] American Development has filed a motion to dismiss which will be treated as a motion for summary judgment. Since there is no genuine issue as to any material fact claimed by any party, we find and conclude that the case is appropriate for disposition on summary judgment.

## II.

The basic factual circumstances surrounding the displacement of plaintiffs from their residences are contained in the stipulation. That stipulation is lengthy and somewhat confusing in its sequence of events. Rather than reproduce the entire stipulation here, we will summarize the pertinent facts. We, of course, incorporate by this reference as further factual findings the stipulation filed by the parties. Any apparent variance between the following summation of fact and the stipulation will be governed by the stipulation.

stipulated that William R. Southerland should be dismissed as a party defendant.

2. Plaintiffs initially sought a temporary restraining order preventing Defendants American Development and HUD from taking any further action whatever to effect their eviction until full URA services and benefits were provided. At a conference with the Court, all parties agreed that, in lieu of a temporary restraining order, all tenants would be relocated through the offices of Westport Cooperative Mission and that acceptance of any relocation assistance would be without prejudice to the legal claims of the parties concerning entitlement to benefits under the URA.

3. Apparently, all tenants in this class have now been displaced and none remain in the build-

ings being rehabilitated by American Development under Project Rehab.

4. HUD and the individual federal defendants filed an earlier motion to dismiss which was not ruled by the Court, in view of the schedule of stipulation and briefs already set up by the parties. The federal defendants continue to assert the validity of their arguments in the motion to dismiss and incorporate them by reference in their motion for summary judgment. Since we will consider matters outside the pleadings, including the stipulation filed by the parties, the federal defendants' motion to dismiss should be treated as a motion for summary judgment. We have considered the arguments presented there which essentially track the arguments presented by HUD in its formal motion for summary judgment.

Project Rehab was initiated by HUD in 1969 as an internally-developed program utilizing existing mortgage insurance programs in an effort to stimulate privately-sponsored rehabilitation of dilapidated inner city properties. The declared purpose of the program was to encourage large scale rehabilitation of existing structures in an effort to provide standard housing for low and moderate income residents of central cities and to meet a portion of the nation's housing production goal for the decade ending in 1978. It was determined by HUD that Project Rehab would be a priority commitment involving full-time staff, special intra-agency organizational relations, and special funding set aside. The program was to be funded through existing mortgage insurance and federal subsidy programs available for residential rehabilitation.

One of the existing mortgage insurance mechanisms utilized by HUD in connection with Project Rehab was the Section 236 program, 12 U.S.C. §§ 1715z–1 et seq. Section 236 of the National Housing Act was enacted in 1968 to provide assistance in financing the rehabilitation and construction of multi-family rental and cooperative projects for low and moderate income families.[5] The type of assistance provided by Section 236 consists of mortgage insurance and periodic interest reduction payments to a private mortgagor to reduce the private sponsor's [6] mortgage interest cost down as low as one percent, depending on the even-

tual tenant's income. Benefits were to be passed on to tenants in the form of lower rents. Tenants in the rehabilitated structure must pay either 25 percent of their adjusted income, or the "basic rental charge" determined by the costs of operating the project with debt service requirements on a one percent interest mortgage, whichever is greater, but in no event will the rental exceed the apartment's fair market value. Normally, a tenant's income for initial occupancy cannot exceed 135 percent of the public housing income limits for the area. Up to 20 percent of the units, and with special permission up to 40 percent of the units, can receive rent supplement assistance which is paid directly to the project owner.[7]

In order for a city to participate in the Project Rehab program, it had to be officially designated by HUD as a Project Rehab city. HUD established a processing procedure with specific criteria for determining on what basis cities would be invited to participate. Cities were screened on the basis of these criteria. Personal visits were conducted by HUD to each city considered. Once a city was designated as a Project Rehab city, HUD would commit the necessary housing subsidy funds.

On October 29, 1970, the City of Kansas City, Missouri, submitted a proposal to HUD, requesting that Kansas City be designated a Project Rehab City. That proposal was based on private sponsorship of large scale rehabilitation, including the use of the

---

5. Section 236 replaced the former Section 221(d)(3) program which provided direct government subsidized below-market interest loans for multifamily projects. 1968 U.S.Code Cong. and Admin.News, 2873, 2894.

6. Eligible mortgagors or sponsors include private, nonprofit organizations, limited distribution corporations, or other entities, cooperative housing corporations, or builders who have made a public agreement to sell to a non-profit or cooperative organization. 24 C.F.R. § 236.-10 (1975).

7. The Section 236 program was modified substantially by the Housing and Community Development Act of 1974, Pub.L. 93–383. 88 Stat. 633. That Act was intended to promote the so-called "economic mix" of tenants. In-

come limits for tenants were changed to 80 percent of the median family income for the area, with the Secretary of HUD having authority to establish higher or lower ceilings. 12 U.S.C. § 1715z–1(i)(2). While the Act requires that 20 percent of the dwelling units be set aside for tenants receiving rent supplement assistance, it authorizes the Secretary of HUD to reduce or increase this percentage depending on the needs of a particular project. 12 U.S.C. § 1715z–1(f)(2) (Supp.1976). The Act also makes other changes, including a provision for operating subsidies to sponsors, which are not pertinent to this case. See *Parker Square Tenants Association v. Department of Housing and Urban Development*, No. 75 CV 577–W–3 W.D.Mo. Jan. 27, 1976.

Section 236 program for multi-family structures. The City also recognized that assistance would have to be provided to persons displaced by the Project and agreed to coordinate such activities through its central relocation agency. After a visit by the HUD Review Team, Kansas City was invited to participate in the program as a Project Rehab City. Kansas City accepted the offer and HUD ear-marked assistance funds to finance rehabilitation of up to 2,500 housing units.

The HUD offer of participation was conditioned on the City's agreeing to establish a Project Rehab Steering Committee [PRSC] which was to coordinate Project Rehab activities in Kansas City. This condition was accepted and the Mayor appointed a Steering Committee consisting of representatives of various housing agencies and programs,[8] and including, in an advisory capacity, a representative of the HUD area office. Among other responsibilities PRSC was charged with the duty of making a preliminary determination on applications of private sponsors seeking mortgage subsidy assistance. PRSC adopted policy statements and procedures governing the processing of applications in order to determine whether the applications submitted would satisfactorily further Project Rehab's goal of rehabilitating dilapidated inner city properties. PRSC screened all applications for assistance, including those submitted under the Section 236 program. Unless the PRSC approved the submission of the private sponsor's application to HUD, it could not be considered for the assistance funds earmarked for Project Rehab.[9] PRSC did not, however, receive any funding from HUD or any other Federal agency.

Defendant American Development Corporation (in its capacity as agent for six California limited partnerships to be formed at the time of initial closing) applied for and was approved as a sponsor by PRSC and HUD to rehabilitate and market six housing projects under Project Rehab. American Development proposed to rehabilitate multi-family structures under the Section 236 program with a projected capacity of 680 dwelling units. All six projects were to receive interest subsidy payments and FHA insured mortgage financing as authorized by Section 236. In addition, each of the limited partnerships which would operate the six individual projects entered into an agreement with HUD for rent supplement assistance to be provided for a certain percentage of the units involved.

After approval of its application for sponsorship, defendant American Development acquired the property for the six multi-family projects, and apparently notified the residents that their tenancies would be terminated. All of the buildings acquired were located outside of areas formerly designated by HUD as Model Cities, Urban Renewal or Neighborhood Development Program areas of Kansas City.[10] At least 450 individuals and families who were occupying these buildings were eventually displaced. The relocation of all these individuals and families was accomplished by means of a private relocation agency and not according to the procedures set forth in the URA.

HUD determined that in areas outside those formerly designated for Model Cities, Urban Renewal, or Neighborhood Development Programs, it would require the private developer to subsidize the actual mov-

---

8. These representatives were:
   Richard H. Fischman, Chairman, Department of Development
   Paul K. Whitmer, Redevelopment Authority
   Pat Daugherty, Public Housing Authority
   John E. Bridges, Model Cities
   Jack D. White, Building Code Division
   Carl C. Patter, Housing Code Division
   Thomas Kilbride, HUD Area Office representative
   Mary Hayes, Human Relations Department of Kansas City

9. Of course, a private sponsor could file an application with the HUD Area Office seeking approval of a Section 236 program using non-earmarked funds.

10. These areas were designated under different HUD programs including the Demonstration Cities and Metropolitan Development Act of 1966, 42 U.S.C. § 3301 *et seq.*, and Title I of the Housing Act of 1949, 42 U.S.C. § 1450 *et seq.*

ing expenses incurred by the displaced persons up to $300. This was done in accordance with the HUD policy on relocation of persons displaced by project Rehab, which was established in 1972. In essence, HUD concluded that moves resulting from private acquisition of property would not qualify the displacee for relocation benefits under the URA unless the displacee resided in areas already designated for Model Cities, Urban Renewal or Neighborhood Development Programs. Accordingly, American Development contracted with a private nonprofit relocation agency, Westport Cooperative Mission, Inc. [WCMI], to administer the relocation of persons residing in the buildings which it acquired for Project Rehab. HUD approved this procedure.[11]

WCMI administered the relocation of all persons displaced by American Development according to plans executed by the respective owners of each project.[12] It tendered a maximum payment of $200 to qualified occupants of each unit designated for rehabilitation and retained the remaining $100 per unit for administrative costs. Funds were apparently provided out of the mortgage proceeds for each project. None of the persons relocated by WCMI received the full benefits, assistance, and services provided by the URA.

### III.

The issue which is presented here involves a matter of statutory construction. The agency argues that plaintiffs are not within the class of persons covered by the URA. Here the acquisition was made by a private party under the Section 236 phase

of Project Rehab. HUD contends that URA benefits are limited by statute to persons displaced as a result of an acquisition of real property by a Federal agency or by a State agency receiving federal financial assistance. Plaintiffs, on the other hand, maintain that they are entitled to URA benefits because they were forced to move as a result of an acquisition of property for a program or project of a federal agency, namely, Project Rehab. They claim that the fact of private acquisition is irrelevant to eligibility under the URA. They emphasize the obvious legislative purpose in enacting the URA,—to promote uniformity and consistency in relocation assistance under all federal programs.

■ The specific question presented, then, is whether tenants displaced by a private acquisition of property, pursuant to a federal project designed to rehabilitate existing multi-family structures under Section 236 of the National Housing Act, are entitled to benefits under the relocation assistance provisions of the URA.

The Uniform Relocation Assistance portion of the URA [13] was designed to standardize the treatment accorded persons displaced as the result of federal and federally-assisted land acquisitions. The Act itself contains the following declaration of policy:

> The purpose of this [title] is to establish a uniform policy for the fair and equitable treatment of persons displaced as a result of Federal and federally assisted programs in order that such persons shall not suffer disproportionate injuries as a result of programs designed for the benefit of the public as a whole. [42 U.S.C. § 4621] [14]

11. Apparently, American Development initially felt that relocation could be accomplished by a contract with the City's central relocation agency. This proposal did not work out, however, and after HUD disapproved one potential private relocation agency, a contract with WCMI was eventually approved both by HUD and PRSC.

12. Only five projects were involved in the relocation effort. No persons were relocated from one of the project sites.

13. Title III of the Uniform Relocation Assistance and Real Property Acquisition Policies

Act, 42 U.S.C. §§ 4651–4655, deals with federal land acquisition practices and is not in issue here.

14. Senator Muskie, in opening the hearings on the Senate Bill which was later enacted in modified form by both houses, stated that:

> Our primary objective in sponsoring S.1 is to establish a uniform policy among Federal agencies, and State and local recipients of Federal funds in their dealings with property owners and others displaced by Federal or Federally aided land acquisitions. [S.Rep. No. 91–488, 91st Cong. 1st Sess. 7–8 (1969)].

Congress was concerned that lack of uniformity in the treatment of persons displaced by Federal and federally-assisted projects was causing an inequitable distribution of the hardship associated with land acquisition for such projects.[15] Congress sought to remedy this problem by providing a host of benefits including relocation payments, advisory assistance, assurance of available housing prior to displacement, economic adjustments, and other assistance to owners and tenants displaced from their homes, farms, and places of business.[16]

In order to further this goal of uniformity in relocation policy, Congress enacted broad and comprehensive legislation intended to cover all persons displaced by federal or federally-assisted programs. In Section 101(6) the Act defines a displaced person as:

The term "displaced person" means any person who, on or after January 2, 1971,

moves from real property, or moves his personal property from real property, as a result of the acquisition of such real property, in whole or in part, or as the result of the written order of the acquiring agency to vacate real property, for a program or project undertaken by a Federal agency, or with Federal financial assistance; and solely for the purposes of sections 4622(a) and (b) and 4625 of this title, as a result of the acquisition of or as the result of the written order of the acquiring agency to vacate other real property, on which such person conducts a business or farm operation, for such program or project. [42 U.S.C. § 4601(6)]

Under Section 202 a displaced person who is forced to move as the result of a program or project initiated by a Federal agency is entitled to receive a payment for actual moving expenses or a moving and dislocation allowance. 42 U.S.C. § 4622.[17] A ten-

---

**15.** Senator Muskie graphically portrayed the effect of the inconsistent government policy on relocation:

> In a typical hardship neighborhood, people on one side of the street were receiving special relocation assistance and fairly negotiated prices for their land, while on the other, they were being evicted with no assistance and compensation, and prices were being offered by Federal authorities at below the appraised value. Up the street an expressway was coming through with a set of moderate benefits and land-taking policies—a situation which has been cleaned up substantially by last year's Federal Aid Highway Act. And in another section of the neighborhood, small businesses were receiving little or no assistance either in relocation or economic adjustment.
>
> The supreme irony of this is the fact that these were problems caused by Federal programs where Federal taxpayer money was involved.
>
> This lack of uniformity only provides irritation and confusion in the communities affected. It provides an unfortunate image of the Federal Government at the State and local level. It results in a continuing and annoying conflict between Federal agencies and State and local aid recipients. And it undermines confidence in and support for Government programs. [S.Rep. No. 91–488, *supra*, at 6–7]

**16.** Moreover, Congress took the unprecedented step of providing a means by which additional housing could be constructed for displaced low and moderate income families. 42 U.S.C. § 4626.

**17.** That section provides in relevant part as follows:

> (a) Whenever the acquisition of real property for a program or project undertaken by a Federal agency in any State will result in the displacement of any person on or after January 2, 1971, the head of such agency shall make a payment to any displaced person, upon proper application as approved by such agency head, for—
>
> *    *    *    *    *    *
>
> (1) actual reasonable expenses in moving himself, his family, business, farm operation, or other personal property;
>
> (2) actual direct losses of tangible personal property as a result of moving or discontinuing a business or farm operation, but not to exceed an amount equal to the reasonable expenses that would have been required to relocate such property, as determined by the head of the agency; and
>
> (3) actual reasonable expenses in searching for a replacement business or farm.
>
> *    *    *    *    *    *
>
> (b) Any displaced person eligible for payments under subsection (a) of this section who is displaced from a dwelling and who elects to accept the payments authorized by this subsection in lieu of the payments authorized by subsection (a) of this section may receive a moving expense allowance, determined according to a schedule established by the head of the Federal agency, not to exceed $300; and a dislocation allowance of $200. [42 U.S.C. § 4622]

ant displaced by such a Federal program or project is eligible for a replacement housing assistance payment up to $4,000 which can be used for the purchase of a home. 42 U.S.C. § 4624.[18] The Act further makes all these benefits available to any person displaced by a State acquisition where the property is furnished as a condition for participation in a Federal program or where the property is acquired by a State agency at the request of a Federal agency for such a program. 42 U.S.C. §§ 4627–28.[19] Finally, all the benefits provided by the Act are made available to persons displaced as a result of a program administered by a State agency with Federal financial assistance. 42 U.S.C. § 4630.[20]

HUD first argues that the definition of "displaced person" includes only individuals displaced as a result of a *federal acquisition* of real property or a *federally-financed state acquisition*. We can find nothing in the Act which suggests such a restriction on entitlement to URA benefits.

18. That section provides as follows:

In addition to amounts otherwise authorized by this title, the head of the Federal agency shall make a payment to or for any displaced person displaced from any dwelling . . . which dwelling was actually and lawfully occupied by such displaced person for not less than ninety days prior to the initiation of negotiations for acquisition of such dwelling. Such payment shall be either—

(1) the amount necessary to enable such displaced person to lease or rent for a period not to exceed four years, a decent, safe, and sanitary dwelling of standards adequate to accommodate such person in areas not generally less desirable in regard to public utilities and public and commercial facilities, and reasonably accessible to his place of employment, but not to exceed $4,000, or

(2) the amount necessary to enable such person to make a down-payment (including incidental expenses described in section 4623(a)(1)(C) of this title) on the purchase of a decent, safe, and sanitary dwelling of standards adequate to accommodate such person in areas not generally less desirable in regard to public utilities and public and commercial facilities, but not to exceed $4,000, except that if such amount exceeds $2,000, such person must equally match any such amount in excess of $2,000, in making the down payment [42 U.S.C. § 4624]

19. Those sections provide as follows:

Whenever real property is acquired by a State agency and furnished as a required contribution incident to a Federal program or project, the Federal agency having authority over the program or project may not accept such property unless such State agency has made all payments and provided all assistance and assurances, as are required of a State agency by sections 4630 and 4655 of this title. Such State agency shall pay the cost of such requirements in the same manner and to the same extent as the real property acquired for such project, except that in the case of any real property acquisition or displacement occurring prior to July 1, 1972, such Federal agency shall pay 100 per centum of the first $25,000 of the cost of providing such payments and assistance. [42 U.S.C. § 4627]

Whenever real property is acquired by a State agency at the request of a Federal agency for a Federal program or project, such acquisition shall, for the purposes of this chapter, be deemed an acquisition by the Federal agency having authority over such program or project. [42 U.S.C. § 4628]

20. That section provides as follows:

Notwithstanding any other law, the head of a Federal agency shall not approve any grant to, or contract or agreement with, a State agency, under which Federal financial assistance will be available to pay all or part of the cost of any program or project which will result in the displacement of any person on or after January 2, 1971, unless he receives satisfactory assurances from such State agency that—

(1) fair and reasonable relocation payments and assistance shall be provided to or for displaced persons, as are required to be provided by a Federal agency under sections 4622, 4623, and 4624 of this title;

(2) relocation assistance programs offering the services described in section 4625 of this title shall be provided to such displaced persons;

(3) within a reasonable period of time prior to displacement, decent, safe, and sanitary replacement dwellings will be available to displaced persons in accordance with section 4625(c)(3) of this title. [42 U.S.C. § 4630] "State agency" is defined as:

The term "State agency" means the National Capital Housing Authority, the District of Columbia Redevelopment Land Agency, and any department, agency, or instrumentality of a State or of a political subdivision of a State, or any department, agency, or instrumentality of two or more States or of two or more political subdivisions of a State or States. [42 U.S.C. § 4601(3)].

Stripped to its essential language, Section 101(6) reads as follows:

> The term "displaced person" means *any person* who . . . *moves from real property*, . . . *as a result of the acquisition* of such real property . . . *for a program* or project undertaken by a Federal agency, or with Federal financial assistance. [Emphasis added]

This definition clearly covers persons in the position of plaintiffs who were forced to move from their residences as a result of the acquisition of real property by defendant American Development for rehabilitation under HUD's Project Rehab. Project Rehab was a "program or project undertaken by a Federal agency." [21] It could also be considered as a program or project undertaken with Federal financial assistance. [22]

■ Although we find no ambiguity in the language of Section 101(6) which could

suggest that plaintiffs were excluded, we will nevertheless proceed to consider HUD's argument based on the legislative history of the URA. See *Train v. Colorado Public Interest Group, Inc.*, —— U.S. ——, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976). HUD contends that the legislative history manifests a Congressional intent to limit eligibility under the URA to federal or federally financed state acquisitions of real property. We find and conclude that the legislative history not only does not support such a notion, but it demonstrates beyond question that the URA was intended to cover *all* persons displaced by federal projects, no matter who acquires the property.

The entire legislative history of the URA emphasizes the need for uniformity in relocation assistance. The House Report, in describing the bill eventually passed without substantial amendment by both houses of Congress, stated the following with re-

---

**21.** In their reply memorandum, the federal defendants attempt to characterize Project Rehab as merely an "advertising effort designed to stimulate the participation of private developers in utilizing existing HUD insurance programs for rehabilitation of privately owned structurally sound properties in inner-city areas." The stipulated facts, however, belie the notion that Project Rehab was merely a public relations campaign.

Project Rehab was an internally developed priority undertaking of HUD with a special project staff and special funding set aside. Although it utilized existing funding mechanisms, such as Section 236, HUD attempted to coordinate the efforts of many different programs and closely monitored the entire operation in cities approved for participation.

Moreover, Project Rehab took on added significance when in early 1973 HUD, presumably at the urging of President Nixon, voluntarily suspended approval of any new applications under the principal housing subsidy programs, including Section 236. See *Commonwealth v. Lynn*, 163 U.S.App.D.C. 288, 501 F.2d 848 (1974). Apparently, this suspension did not affect funds already committed for Project Rehab.

**22.** "Federal Financial Assistance" is defined as:

> The term "Federal financial assistance" means a *grant, loan,* or *contribution* provided by the United States, except any Federal guarantee or insurance and any annual payment or capital loan to the District of Columbia. [42 U.S.C. § 4601(4)] (Emphasis added)

HUD's argument limiting eligibility to Federal or State acquisitions may stem in part from the apparent omission in URA of any mention of displacements by private entities receiving federal financial assistance. Although the definition of "displaced person" would, as we have concluded, cover such private displacement, the entitlement sections of the Act refer only to programs or projects undertaken by a Federal agency and State programs receiving Federal financial assistance. See *Parlane Sportswear Company, Inc. v. Weinberger*, 381 F.Supp. 410 (D.Mass.1974), *aff'd.* 513 F.2d 835 (1st Cir. 1975), *cert. denied* 423 U.S. 925, 96 S.Ct. 269, 46 L.Ed.2d 252.

No section explicitly provides that the benefits accorded displaced persons under the Act extend to those displaced by private entities receiving Federal financial assistance outside of any specific Federal agency project, such as Project Rehab.

We note, however, that each entitlement section dealing with displacement for a Federal agency program provides for payments and services to "displaced persons." We do not believe that such a reference was accidental. It can only mean that the broad definition of "displaced person" contained in Section 101(6) is fully incorporated into the entitlement sections of the Act. This incorporation suggests that private acquisition for a public project undertaken with federal financial assistance under a specific Federal agency program entitles the person displaced to the full range of URA benefits.

spect to the definition of "displaced person" in Section 101(6):

It is immaterial whether the real property is acquired before or after the effective date of the bill, or by Federal or State agency; or whether Federal funds contribute to the cost of the real property. The controlling point is that the real property must be acquired for a Federal or Federal financially assisted program or project. [1970 U.S.Code, Cong. & Admin. News, 91st Cong. 2d Sess., at 5853]

The Report went on to cite an example of a federal project where real property might not be acquired by the federal government:

Post Office Department witnesses before the committee called attention to the fact that although the Department's construction requirements involve about 1,000 buildings annually, the postal building program, as such, accounts for only a few construction starts each year. Occasionally, the Department acquires the site and transfers it to the successful bidder for construction and lease back to the Department. In most cases, however, building sites are obtained through the Department's leasing authority. Usually, the sites are controlled through an option procedure with title neither vesting in or passing through the Post Office Department. Instead, the option is assigned to a successful bidder who becomes the owner of the land, and the Department's

long-term lessor. Some of these sites are for large postal facilities to be constructed in metropolitan areas where the only available and suitable land is occupied by numerous low-income individuals and families, and by small businesses.

*It makes no difference to a person required to move because of the development of a postal facility which method the postal authorities use to obtain the facility, or who acquires the site or holds the fee title to the property.* Since the end product is the same, *a facility which serves the public and is regarded by the public as a public building,* any person so required to move is a displaced person entitled to the benefits of this legislation. [*Id.* at 5854] (Emphasis added).

This statement on the scope of URA clearly evinces a Congressional intent to cover all displacements resulting from public projects utilizing federal funds.[23]

■ The other citations to legislative history deal with the sections of the Act requiring full relocation assistance for State acquisitions with federal financial assistance. We do not find them relevant to plaintiffs' entitlement under the sections applicable to Federal programs or projects.[24]

■ HUD next argues that the URA contains a clause excluding, by implication, persons displaced by private acquisitions

---

**23.** It cannot be doubted that the buildings rehabilitated under Project Rehab "serve the public" and are regarded as a form of public housing. All the projects of American Development Corporation in this case have a certain percentage of units set aside for rent supplement assistance. The Section 236 program is intended to meet the nation's housing requirements by utilizing incentives for private development. The public character of such projects is demonstrated by the requirement of a due process hearing before a tenant may be evicted from Section 236 housing. *Lopez v. Henry Phipps Plaza South, Inc.,* 498 F.2d 937, 942 (2nd Cir. 1974) (per Friendly, J.).

Indeed, the governmental involvement in Section 236 is so pervasive that procedural due process may even apply to any rent increases. See *Geneva Towers Tenants Organization v. Federated Mortgage Investors,* 504 F.2d 483 (9th Cir. 1974); *Dew v. McLendon Gardens*

*Associates,* 394 F.Supp. 1223 (N.D.Ga.1975). See, generally, *Note, Procedural Due Process in Government Subsidized Housing,* 86 Harv.L. Rev. 880 (1973).

**24.** Both plaintiffs and HUD refer the Court to Congressional attempts to amend URA to provide benefits for those persons displaced as a result of a Section 236 project. Plaintiffs argue that such an amendment would only clarify eligibility under an isolated Section 236 project not associated with a specific HUD project, such as Project Rehab. It is unnecessary to consider the significance of these attempted amendments or the statements by various members of Congress on the scope of the URA. The views of one Congress as to the meaning of a statute enacted by an earlier Congress are to be accorded little weight. *United States v. Southwestern Cable Co.,* 392 U.S. 157, 170, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968).

under the Section 236 program. This argument is based on Section 217 of the Act which provides as follows:

A person who moves or discontinues his business, or moves other personal property, or moves from his dwelling on or after January 2, 1971, as a direct result of any project or program which receives Federal financial assistance under title I of the Housing Act of 1949, as amended, or as a result of carrying out a comprehensive city demonstration program under title I of the Demonstration Cities and Metropolitan Development Act of 1966 shall, for the purposes of this subchapter, be deemed to have been displaced as the result of the acquisition of real property. [42 U.S.C. § 4637]

HUD contends that this section is a specific exception to the general requirement that a person be displaced by a federal acquisition or a federally financed state acquisition. Section 217 provides URA benefits for any person who moves as a result of a rehabilitation, demolition, or concentrated code enforcement program under Title I of the Housing Act of 1949, 42 U.S.C. § 1450 *et seq.*, or a comprehensive city demonstration project under the Demonstration Cities and Metropolitan Development Act of 1966, 42 U.S.C. § 3301 *et seq.* Such displacement may occur without any federal or federally financed state acquisition of real property. According to HUD, the inclusion of two specific programs where displacement might occur in the absence of any Federal or federally financed state acquisition of property means that other programs involving non-governmental private acquisition are excluded from coverage under the URA. We find nothing in Section 217 which can fairly be read to exclude private displacement in connection with a federal project utilizing Section 236 mortgage subsidies.

In the first place, Section 217 cannot be read as an exclusionary clause. It would be contrary to the whole purpose of the Act to read an exclusion into it without explicit language. Nothing in the language of Section 217 can be regarded as an exclusion, either explicitly or by implication.

Moreover, the legislative history of Section 217 is a further demonstration of the comprehensive scope of the URA. The House Report states the following with respect to Section 217:

This section provides that any person who moves as the result of a rehabilitation, demolition, or concentrated code enforcement program under title I of the Housing Act of 1949, or a comprehensive city demonstration project under title I of the Demonstration Cities and Metropolitan Development Act of 1966, shall be considered to be displaced as the result of the acquisition of real property for such a program or project. This makes such a person eligible for the full range of relocation benefits provided for displaced persons in title II of the bill.

Such persons are presently defined as displaced persons, and eligible for relocation payments and assistance, in programs of the Department of Housing and Urban Development. *This section therefore merely continues established policy with respect to such persons.* [1970 U.S. Code Cong., and Admin.News, supra, at 5869] (Emphasis added)

Section 217 was then merely a continuation of prior law repealed by the URA. More importantly, it was intended to cover displacement caused by activities such as rehabilitation by owners and code enforcement *where there would be no acquisition of property whatsoever.* The language of the Section states that anyone displaced by such activities "shall . . . be deemed to have been displaced as the result of *the acquisition* of real property." [42 U.S.C. § 4637] (emphasis added). Clearly, then, Section 217, rather than being an exclusion, is a broad entitlement section that provides coverage for persons displaced by federally-assisted housing projects which do not require actual acquisition of real property. In sum, we find and conclude that plaintiffs unquestionably come within the class of persons entitled to URA benefits.

## IV.

■ Under Section 213 of the URA, federal agencies are authorized to establish regulations for the administration of payments and assistance under the URA "in a manner which is fair and reasonable, and as uniform as practicable." 42 U.S.C. § 4633(b)(1).[25] HUD has issued regulations implementing its duties under the URA. 24 C.F.R. § 42.1. *et seq.* (1975). HUD argues that these regulations preclude URA benefits where there is no federal acquisition or federal financial assistance to a state or state agency which acquires real property. We find and conclude that the HUD regulations cited do not explicitly limit URA benefits in this way, and to the extent that they may be read to do so, they are inconsistent with the URA itself.

Under 24 C.F.R. § 42.20(h)(15) (1975),[26] HUD defines "federal financial assistance" to include interest reduction payments under Section 236: ˙

> where contributions are made to a state agency and the performance by such state agency, or by a private body acting on behalf of such agency, of the undertakings necessary to enable it to receive such contribution will be the direct cause of displacement. . . .

In essence, HUD claims that this regulation precludes payment of URA benefits to persons displaced by private acquisitions because those persons are not required to move on account of any program receiving "Federal financial assistance." Federal financial assistance, according to HUD, is limited to assistance given to state agencies and excludes assistance to private develop-

ers. We find this argument without merit for two reasons.

First, HUD implicitly assumes that plaintiffs would not come within the alternative definition of "displaced person" under Section 101(6) of the Act. That section, as quoted above, makes eligible any person who moves from real property as the result of its acquisition "for a program or project undertaken by a Federal agency . . .." 42 U.S.C. § 4601(6). We have already concluded that Project Rehab was such a program of a federal agency. Just because HUD does not itself perform the rehabilitation here does not mean that this is not a federal agency project.

Second, even if we were to assume that plaintiffs did not come within the federal program or project section, HUD has ignored the definition of "Federal financial assistance" contained in the Act itself. Section 101(4) defines "Federal financial assistance" as: "a grant, loan, or *contribution* provided by the United States, except any Federal guarantee or insurance and any annual payment or capital loan to the District of Columbia." [42 U.S.C. § 4601(4)] (Emphasis added) Nothing in this section suggests that only "contributions" made to State agencies are to be considered "Federal financial assistance." To read the regulations as HUD suggests would be contrary to the entire thrust of the URA, which is to provide uniform benefits for all persons displaced by federal and federally assisted projects.[27] To the extent that 24 C.F.R. § 42.20(h)(15) may attempt to engraft a narrower eligibility standard than the plain language of the URA provides, it is inconsistent with the statute and cannot be fol-

---

**25.** These regulations must also be "consistent with the provisions of this [Act] . . ." 42 U.S.C. § 4633(c). ˙

**26.** HUD cites this regulation as 24 C.F.R. § 42.-20(g)(15). Apparently, HUD is referring to 24 C.F.R. § 42.20(g)(14), which was the 1974 C.F.R. citation. The regulation has not been changed as repromulgated in the 1975 Code of Federal Regulations.

**27.** HUD also argues that its interpretation of the URA is consistent with the practice of oth-

er federal agencies. However, no regulation of any other agency is cited. We note that the Postal Service apparently takes a different view since it makes eligible "tenants displaced as a result of acquisition by a successful lease bidder" for a Postal Service project. 34 C.F.R. § 777.2(g) (1975). This is clearly a private acquisition. Also, the Department of Health, Education and Welfare now includes some private acquisitions in its regulation implementing the URA. See N. 29, *infra.*

lowed. See *Tullock v. State Highway Commission, supra,* at 716–717.[28]

## V.

There are very few reported decisions dealing with the eligibility requirements under the URA. HUD calls our attention to several cases, most of which are unreported, which it claims support its interpretation of the URA. None deal with acquisitions for Section 236 or other housing subsidy programs conducted under such close HUD supervision as Project Rehab. We find and conclude that none of the cases cited by HUD are applicable to the factual situation presented here.

HUD places greatest reliance on *Parlane Sportswear Company, Inc. v. Weinberger,* 513 F.2d 835 (1st Cir. 1975), *cert. denied* 423 U.S. 925, 96 S.Ct. 269, 46 L.Ed.2d 252. That case involved the displacement of a manufacturer, Parlane Sportswear, by a private university for the establishment of a Cancer Research Center, funded by a grant from the Department of Health, Education and Welfare (HEW). Although in rejecting the manufacturer's claim of entitlement to URA benefits, the Court spoke in terms of private displacement with federal financial

assistance not being covered by the URA,[29] it is clear that there was no federal program or project of the type contemplated by Section 101(6) of the URA. Cf. *Caramico v. Secretary of the Department of Housing and Urban Development,* 509 F.2d 694, 697–99 (2d Cir. 1974). The Court stated as much. 513 F.2d at 837. The federal assistance was merely a grant for medical research and did not involve any "public improvement program" or "public works project" like Project Rehab. 1970 U.S.Code Cong. & Admin.News, at 5851–52.

Moreover, it appears that the University did not acquire this property *for* the federally funded cancer research center. Rather, the University already held title to the building and merely leased it to the manufacturer. When it received the federal grant it evicted its tenant whose lease had already expired. The URA exceptions to the acquisition requirement, one of which is contained in Section 217 discussed above, 42 U.S.C. § 4637, would clearly not apply to the facts of *Parlane.* Therefore, that case may be read to exclude from URA eligibility those persons displaced from property in absence of any acquisition and who do not come within one of the specific exceptions for displacement without acquisition.[30] Cf.

**28.** HUD also refers the Court to its Relocation Handbook which restates the same basic eligibility criteria, limiting relocation payments under Section 236 projects to programs where the entity receiving HUD assistance is a State agency and where the displacement is a result of the State agency's compliance with conditions precedent to receiving assistance. To the extent that the Handbook imposes a limitation on relocation assistance not contained in the URA, we also find it inconsistent with the Act.

**29.** The Court recognized, however, that not all private displacements were excluded from coverage under the URA. Indeed, it pointed to HEW's amendment of its regulations to provide benefits for persons displaced by private entities acting as agents or contractors of the Department. See 45 C.F.R. § 15.6 (1974). The Court stated the following with respect to the amendment:

The committee report indicates, H.R.Rep. No. 1656, 91st Cong., 2d Sess. (1970), reprinted in 1970 U.S.Code Cong. & Admin.News, pp. 5850, 5853–54, that it is immaterial that a private person actually acquires, builds or holds title to the site if the facility "serves the public and is regarded by the public as a

public building." We think the regulation's exception is addressed to such a situation and is inapplicable here. Compare the definition of "agent" in 42 U.S.C. § 4628. [513 F.2d at 837]

**30.** *Parlane* points up the difficulty associated with displacement by private entities receiving federal financial assistance. The District Court called attention to the seeming inconsistency between the broad expression of Congressional intent to compensate all persons displaced by federally funded projects, and the apparent limitation contained in the operational sections of the Act. 381 F.Supp. at 412. For example, we have noted above that while the definition of "displaced person" contained in Section 101(6) is very broad, the entitlement sections apparently limit eligibility to persons displaced as the result of an acquisition for a program or project of a federal agency, 42 U.S.C. §§ 4622, 4627, 4628, or for projects by State agencies receiving federal financial assistance, 42 U.S.C. § 4630. The entitlement sections nowhere address displacement for projects conducted by private entities that receive federal financial assistance.

In this case, there is no difficulty in finding entitlement under the "Federal program or

*Harris v. Lynn,* 411 F.Supp. 692 (E.D.Mo. 1976) (demolition of public housing project by St. Louis Housing Authority does not entitle residents to Relocation Assistance because no acquisition of property).

The other cases cited by HUD are similarly inapposite since they do not involve acquisition of property for federal programs or projects or those utilizing federal financial assistance.

## VI.

In summary, then, we have determined that plaintiffs are entitled to full relocation assistance and benefits under the URA. We have rejected the arguments of HUD that would limit those benefits only to persons displaced as a result of a federal acquisition of real property or a State acquisition with federal financial assistance. We have concluded that Project Rehab is a "program or project undertaken by a Federal agency, or with Federal financial assistance." Accordingly, HUD, the federal agency involved, is responsible for providing the full relocation benefits contained in the URA. Since no theory of liability has been suggested as to defendant American Development Corporation, plaintiffs' claim against it will be dismissed.

For the reasons stated, it is

ORDERED (1) that plaintiffs' motion for certification of a class should be and the same is hereby granted. It is further

ORDERED (2) that plaintiffs' motion for summary judgment on the question of liability against the federal defendants should be and the same is hereby granted. It is further

ORDERED (3) that the motion for summary judgment filed by the federal defendants should be and the same is hereby denied. It is further

ORDERED (4) that the motion of defendant American Development Corporation to dismiss should be and the same is hereby granted.

project" sections of the Act. The scope and magnitude of HUD's commitment to rehabilitation and expansion of low and moderate income housing clearly makes Project Rehab that kind of program which the URA was intended to cover.

Individual sponsorship of Section 236 housing outside of a specific HUD project, such as Project Rehab, would present a different question. We have suggested above that the use of the term "displaced person" in the entitlement sections of the Act would appear to mean that the broad definition of Section 101(6) is to be incorporated in those sections dealing with Federal agency programs, 42 U.S.C. §§ 4622–28. This may be a way to harmonize the apparent inconsistency noted by the District Court in *Parlane.* Whether such a Section 236 project would be considered a "project undertaken . . . with Federal financial assistance" is a question we need not reach. We would suggest that such a reading would be appropriate if the Act is to be given the broad and comprehensive application apparently intended by the Congress. We do not, however, have that question before us in this case.